Filed 10/28/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| D.T.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,<br><br>        Respondent;<br><br>SAN FRANCISCO HUMAN SERVICES AGENCY et al.,<br><br>        Real Parties in Interest. | A145246<br><br>(City & County of San Francisco Super. Ct. Nos. JD06-3455, JD06-3455A, JD06-3456) |

D.T. (Mother), a single parent of five children subject to dependency proceedings, petitions for extraordinary relief, seeking to reverse a court order denying her further reunification services with respect to her three oldest children[1] and seeking to stay a hearing under Welfare and Institutions Code[2] section 366.26 that had been set for September 16, 2015. (Cal. Rules of Court, Rule 8.452.)[3] Mother claims the court erred in denying her further reunification services under section 361.5, subdivision (b)(10) because she has made and continues to make reasonable efforts to address the problems

---

[1] Two younger half-siblings have been declared dependents but are not before us in this matter.

[2] Statutory references are to the Welfare and Institutions Code unless otherwise specified.

[3] Further references to rules are to the California Rules of Court.

1

that led to the removal of her children, and denial of additional services is not in the children's best interests. Due to the complexity of the arguments, and to permit supplemental briefing, we stayed the hearing set for September 16, 2015. As we shall explain, Mother has received extensive child welfare services and yet has taken advantage of them only sporadically. More fundamentally, Mother is simply not entitled to any further reunification services without a showing that reunification is the best alternative for the children. At this advanced stage of the proceedings we are concerned solely with the best interests of the children.

These children have been involved with the dependency system for 11 years, and it has not served them well. Since their first contact with the system, they have spent some six years in out-of-home placement with multiple caregivers, not always in healthful circumstances. Despite nearly constant involvement of the Agency for more than a decade, Mother's drug abuse, coupled with her mental instability and her abusive relationships with men, has exposed the children to a continuing risk of harm, delayed their educational development, and left them without a stable home.

The court's factual findings in determining to withhold further services were supported by substantial evidence. Still, we conclude the court used the wrong statute in determining Mother's entitlement to additional reunification efforts, but the error was harmless in light of the findings actually made. The court gave Mother more consideration than she was entitled to under the correct statute, and it did not abuse its discretion in denying her further services and setting a hearing under section 366.26. We deny the petition and lift our earlier stay of the hearing under section 366.26.

**BACKGROUND**

Mother gave birth to twin girls (both with initials J.C.) in January 1998. A.S., their half-sister, was born in August 2002. The San Francisco Human Services Agency, Family and Children's Services Division (Agency), became involved in September 2004, responding to numerous referrals for general neglect by providing Mother with family preservation services in the apparent hope of avoiding a dependency petition.

2

In January 2005, A.S., at age two, received severe burns over five percent of her body in suspicious circumstances after Mother left her in the care of an abusive boyfriend, so the Agency filed a first dependency petition under section 300. The children were placed with G.T., a maternal great aunt and were declared dependents. Mother received reunification services, and after several months out of the home the children were returned to Mother. During that dependency it was also discovered that Mother was involved in a battering relationship and had also been involved in abusive relationships with the fathers of both A.S. and the twins. After the children had spent some months in Mother's home with Agency supervision and family maintenance services, the section 300 petition was dismissed in June 2006 and jurisdiction was terminated.

But six months later the Agency once again became involved with the family when Mother was found passed out drunk on a city bus at 10:00 p.m. with her three children present but unattended. The twins, then age eight, and A.S., age four, were soaking wet and cold following a day at the beach, and the whole family was transported to the hospital, where the children were diagnosed with mild hypothermia. The children said Mother had behaved oddly at the beach, with pronounced religiosity. She drank alcohol and took them into the water over her head. They were traumatized because they believed she was trying to drown them.

Consequently, on December 5, 2006, the Agency initiated the dependency here under review by again filing a petition on behalf of the three children under section 300, subdivisions (b) and (g), alleging the fathers' whereabouts were unknown and Mother had failed to protect them. The children were temporarily detained in foster care in Vallejo.

The Agency's jurisdiction and disposition report revealed that, after the prior dependency petition was dismissed, Mother had failed to follow up with substance abuse aftercare treatment or attend her mental health therapy. The twins were already "years" behind in school and "excessively absent and tardy." A.S. also had poor school attendance. The children had been witnesses to, and victims of, domestic violence

perpetrated by Mother's partners. Mother also had a substance abuse problem and minor criminal history.

Mother submitted to the section 300 petition and the allegations were sustained. The children remained in foster care in Vallejo until fall 2007, when they were placed with their maternal aunt, L.H., in Oakland. The Agency provided reunification services for Mother throughout this period. (See § 361.5, subd. (a); *Rosa S. v. Superior Court* (2002) 100 Cal.App.4th 1181, 1188–1189 (*Rosa S.*) [parent entitled to new period of reunification services when original dependency is dismissed and new § 300 petition is filed].)

A psychologist who evaluated Mother in April 2007 diagnosed her as a paranoid schizophrenic who should be evaluated for drug dependence and abuse. Mother had a tendency to get involved in abusive relationships and had a high risk for suicide. The incident at the beach may have been a suicide attempt. She also had a tendency to detach from reality when faced with stressful situations. The psychologist summarized: "with impairment in her cognitive functioning, judgment, reality testing, and possibly activities of daily living, [Mother] is already having great difficulty functioning on her own. She is likely to have limited ability to handle three children as a single mother."

As part of her reunification services, Mother was accepted into a dual diagnosis residential treatment program designed to serve those with both substance abuse and mental health issues, but she exhibited psychotic symptoms and was uncooperative in taking her prescribed psychotropic medications. Mother had difficulty accepting her mental health diagnosis. Her primary counselor at the residential program, other program staff, and her individual therapist all had concerns as to whether Mother would be able to remain stable after she left the program, in part because she said she would not continue taking her medication after she left.

By the time of the 12-month review, the Agency recommended that reunification services to Mother be terminated and that a hearing be set under section 366.26. In June 2008, a permanent plan of long-term foster care was ordered by the court. The children were ordered to remain with L.H. pending a section 366.26 hearing set for October 2008.

4

Reunification services to Mother were terminated. (§ 366.21, subds. (g) & (h).) Mother then sought writ relief in this court, which was denied. (No. A121939.)

The section 366.26 hearing was continued to January 2009. The court adopted a permanent plan for all three children to live in a Kinship Guardianship Assistance Payment program (Kin-GAP) legal guardianship with L.H., without termination of parental rights.[4] The dependency petitions with respect to all three children were dismissed and jurisdiction terminated on January 28, 2009, but Mother was granted supervised visits twice a month with all three children, as long as she appeared clean and sober and mentally stable. (§ 366.26, subd. (c)(4)(C).)

As Mother pursued her visitation rights, L.H. resisted. A little over a year later, Mother petitioned under section 388, requesting a court order for ongoing visits with her children because L.H. was not allowing her access. Mother also asked the court to reinstate dependency if necessary. In March 2010, the petition was granted, counsel was re-appointed for Mother, and dependency jurisdiction was resumed. (See § 366.3, subd. (b).)

When the Agency investigated Mother's complaints, it learned the children were still suffering from neglect in L.H.'s care and were frequently absent from school. The social worker described L.H.'s home as "very dirty, clothes lying all over the place, and . . . overall very unkempt." L.H. also had a criminal record, and had been arrested for possession for sale of a controlled substance after the children were placed in her care. School officials suspected she smoked marijuana while driving the children to school. With the guardianship in peril and Mother showing improved stability, in October 2010,

---

[4] Kin-GAP is a state program that provides ongoing funding for children who exit the dependency system to live with relative legal guardians. In order to receive funding under the program, the county welfare agency must enter into a written binding agreement with the relative guardian and dependency jurisdiction must be terminated. (§ 11385 et seq.; *In re Priscilla D.* (2015) 234 Cal.App.4th 1207, 1211, fn. 2.)

5

the court ordered "once a week family therapy for Mother and minors" and Mother was again allowed twice monthly supervised visits.[5]

The Agency filed a supplemental section 387 petition and a section 388 petition in mid-December 2010, and all three children were detained from L.H. At the end of January 2011, the Agency began offering Mother family therapy to heal the relationship with the three older children. On March 30, 2011 the guardianship was terminated, a new permanent plan of long-term foster care was ordered, and the children were placed in intensive therapeutic foster care in Antioch.

By this time Mother had given birth to a fourth child in October 2009, a boy with initials A.R. She was not involved with the Agency for A.R.'s benefit, and she showed signs of having "learned from her past mistakes." Mother also had obtained childcare for A.R. so she could work full-time.

In a status report filed in October 2011, the Agency reported the twins (age 13) and A.S. (age 9) were in foster care in Oakland. They continued to exhibit behavioral problems and poor academic performance. At about this time, due to the twins' behavior problems, they were removed from their foster home, temporarily placed with a respite provider, and later with E.C., their paternal grandmother in San Francisco, while A.S. remained in intensive therapeutic foster care. With the female sibling triad splintering, the court ordered an updated psychological evaluation of Mother to assess whether she should be allowed to reunify with the children.

Twice in early 2012 the twins ran away from their paternal grandmother's home and were believed to be staying with L.H. In March 2012 Mother filed a section 388 petition requesting that the children be returned to her care with Agency oversight. In spite of Mother's long-term drug abuse, it appeared she had attained sobriety for a

---

[5] The twins had requested termination of visits with Mother in July 2010 and all three children again requested supervised visits in November 2011, in part because Mother was keeping company with a man who had molested the twins when they were living with Mother. They had told Mother about the abuse, but she refused to believe them.

6

substantial period and was now capable of providing a safe home for her children. The children also told the social worker they were "tired of foster care" and wanted to go home. The Agency's report recommended placing all three children with Mother under the Agency's supervision. On March 27, 2012, the court renewed the dependency and adopted the Agency's placement recommendation, ordering a new permanent plan of "return home." There is no dispute that Mother began receiving family maintenance services at least as of that time. (§ 16506.)

By early April, however, the twins had run away to L.H.'s house. One returned home quickly, but the other stayed for weeks, missing school. Mother sought and was granted a five-year restraining order against L.H., protecting herself and the children. Despite the restraining order, L.H. soon moved in with Mother and the children.

The Agency filed a status review report under section 364 in November 2012 which reported that Mother was not regularly engaged in individual therapy and had not seen her psychiatrist in four months. Mother had lost a lot of weight, and the social worker became concerned she had relapsed with drugs. When confronted, Mother denied using drugs but refused to take a drug test.

In March 2013, the social worker reported she had offered Mother a number of referrals to get help from various social service entities, but Mother had not followed up. The twins continued to present behavioral challenges and to have problems with school attendance. In the first 75 days of 2013, the social worker had received half a dozen calls from the police relating to conflicts between Mother and the twins. Despite these warning signs, the Agency recommended an additional six months of services.

In fact, in early August 2013 the Agency recommended that Mother be allowed to retain custody of the three children and that dependency jurisdiction be terminated. That recommendation was short lived, however, as the Agency filed a section 300 petition on behalf of A.R. about two weeks later, after receiving referrals based on Mother's neglect. A.R., age three, had been observed going into and out of the apartment by himself, with no supervision. When confronted, Mother admitted she had relapsed with drugs. Hence,

7

the plan to allow Mother to regain unsupervised custody of the older children was scuttled.

In September 2013 the Agency required Mother to begin random drug testing; she produced one urine sample that tested positive for cocaine and two negative tests. She then refused further testing. In November or December 2013, Mother began attending an outpatient drug treatment program but did not complete the intake process. She told the counselor she did not want treatment. She was also instructed to attend NA meetings but never provided proof of attendance. Despite the setbacks, the Agency once again recommended placement of the three girls with Mother under the Agency's supervision, with six more months of family maintenance services.

On January 29, 2014, the court allowed the children to remain in Mother's home with continuing family maintenance services upon certain conditions, including that she maintain good contact with the Agency, refrain from substance abuse, submit to random drug tests, undergo mental health care, take prescribed medications, participate in individual and family therapy, get the children to school on time, and learn non-physical, age appropriate discipline techniques. On the same date, A.R. was also adjudicated a dependent child.

In April 2014, one of the twins, at age 16, gave birth to a baby boy, A.C. Both the teenage mother and her baby continued living with Mother. In July 2014, Mother gave birth to a fifth child, N.R., a girl. In July 2014, the Agency recommended that all four dependent children remain in Mother's home, under Agency supervision, with continuing services. Before the next six-month review, Mother and the Agency agreed through mediation to allow the children to stay in her care, with certain commitments by her to attend therapy, get appropriate medical care for the children, make sure they attended school, and cooperate with their educational needs. In August 2014, the court renewed the dependency, left the children in Mother's care under Agency supervision, and adopted the terms of the mediation agreement, including an order for continuing services.

In September 2014, Mother showed up at the Agency's shelter smelling of alcohol. The shelter workers asked her to take a drug test, but she refused. Ten days

later, the Agency received a report that one of the twins had run away to Sacramento with three older males who had engaged in criminal activity along the way. J.C. did not want to engage in criminal activity, so she reported to the police in Sacramento for help because she was stranded there. Mother failed to report to the Agency that her daughter had run away.

Supplemental petitions were filed under section 387 for the twins and A.S. on November 18, 2014, alleging Mother's continuing drug abuse problems, involvement in a relationship plagued by domestic violence, failure to provide for the children's educational needs, failure to follow through with Agency referrals, and with respect to A.S., a previous failure by Mother to reunify with the twins. A new section 300 petition was filed for N.R. (No. JD14-3385) as was a supplemental petition under section 387 for A.R. (No. JD13-3247). The Agency recommended that Mother's reunification services be terminated and that services to her be bypassed on behalf of the younger children, citing section "361.5 (10)." The Agency's attorney at trial clarified he was proceeding under section 361.5, subdivision (b)(10). He did not differentiate between the older and younger children in that regard.

The petitions evidently were filed in response to a report by A.S., later substantiated by the Agency, that Mother was using crack cocaine with her boyfriend (the father of A.R. and N.R.), and they were using all of the family's financial resources on drugs. A.S. reported that Mother and her boyfriend would leave the house at all hours and not return until the next day or later. The children were left at home during those times without food or money, usually in the care of L.H., who (despite the restraining order) sometimes stayed with the family to help Mother take care of the children. A.S. also reported that Mother was able to pass drug tests by using A.R.'s urine for the tests.

A.S. also said Mother's boyfriend had struck Mother in the face a few days earlier, leaving a mark on her forehead, again substantiated by the Agency. Mother later admitted the abuse had occurred in front of A.R. and N.R. Mother promptly obtained a restraining order against her boyfriend on behalf of herself and the children. Nevertheless, the Agency had received at least ten referrals during the time the children

9

had been placed with Mother, related primarily to the boyfriend being "in and out of the home" and "using the family resources, which left the home without food."

The Agency's report filed November 18, 2014, recited that Mother had received 31 months of family maintenance services for the three older children since April 2012. Mother had been offered "extensive services" for substance abuse and parenting effectiveness, but she "refused to engage in the services." The report detailed Mother's failure to take advantage of services that had been offered. For instance, though Mother was referred to a therapist for family therapy, she failed to start therapy until July 2014 and had quit again by September 2014. She had a long-standing relationship with both a therapist and a psychiatrist in connection with her schizophrenia, but she had not seen either "in months."

As of November 2014, none of the four older children were up-to-date on their medical and dental care, and although Mother was offered referrals, she did not follow up or falsely reported that she had followed up when she had not. The twins also lost the opportunity for individual therapy because Mother failed to follow through on referrals to two different therapists.

Mother also had a tendency to stand in the way of educational opportunities for her children, being only minimally cooperative with the school's efforts to establish an individual educational plan for the twins and failing to follow up on opportunities for them to receive tutoring. The twins continued to be absent from school frequently. A.S. also had been accepted into a middle school, but because Mother did not attend an orientation meeting, A.S. was dropped from the roster and could not attend that school. A.S., like her older sisters, struggled with truancy, as she stayed home to care for her two younger half-siblings. Although Mother was sent a truancy letter by A.S.'s school, she was "not responsive." A.S. also had poor academic performance, with a grade D average. A.S. was also seeing an individual therapist who was concerned about her self-harming inclinations.

On December 3, 2014, the court found a prima facie case the children came within section 300 and ordered them all detained. The twins were placed with A.M., a non-

10

related extended family member (NREFM) (A.C.'s grandmother), while A.S. and A.R. were placed in foster care in Sacramento. N.R. was placed separately in foster care. On January 11, 2015, A.S. and A.R. were moved from their foster placement in Sacramento to respite care due to behavioral issues.

The contested jurisdiction/disposition hearing was not held until April 23, 2015. The point of contention was whether Mother should get further reunification services. Mother had received family maintenance services from March 27, 2012 to November 19, 2014 (a total of 31 months). Despite some very recent progress by Mother in complying with services, the Agency continued to recommend no further services for Mother.

An addendum report prepared for all five children on April 14, 2015 updated the court on the children's status. The twins had absconded from their placement with the NREFM and were staying in the home of L.H., which was not an approved placement. They had been offered separate placements in two different approved homes, but they refused to be separated. At the time of the hearing, the twins were deemed "homeless" because they were living in an unapproved home. They were not receiving foster care payments or any other financial assistance because they were considered "AWOL" and were not enrolled in high school for the same reason.

After an initial failed placement in Sacramento, A.S. was placed in a foster home with her little brother, A.R., in January 2015. But when tensions developed between the two children, A.R. was moved to a different placement. As of the contested hearing, A.S. seemed to be adjusting well and the placement was deemed "stable" by the Agency. A.R., on the other hand, had been placed in four different foster homes between November 2014 and April 2015. His current foster mother was certified for intensive therapeutic foster care and seemed "committed to [A.R.]." N.R., too, was in a stable foster placement.

The April 2015 addendum also noted that A.S. did "not want to be returned to her mother." She was in individual therapy and was in the sixth grade in school, with a 1.67 grade point average. Her educational, medical and dental needs were being met much better while in foster care, and the social worker was beginning to facilitate tutoring for

11

her. During the family maintenance period, Mother had denied service providers access to A.S., and A.S. had also been truant from school. The relationship between Mother and A.S. was "conflictive" and full of "tension" which persisted and "escalate[d]" over time. A.S. "did not feel safe in the home due to mom allowing her partner into the home . . . ." A.S. requested that her visits with Mother and A.R. be terminated, so she had no visits with them after March 10, 2015, although she continued visiting with the twins, with N.R. and with A.C.

N.R. and A.S., at the time of the disposition hearing were having visits with a close family friend, H.E., who was interested in taking custody of N.R. and had also "made a commitment to being a permanent home" for A.S. Another of Mother's sisters also had expressed interest in giving the children a permanent home and was being considered as a permanent placement for A.R. Both homes were being assessed as of late April 2015. According to A.S.'s opposition to Mother's petition for extraordinary relief, she is now placed with a NREFM, presumably H.E., who has "expressed interest in being a permanent home for [her] either through adoption or legal guardianship." Her attorneys suggest it is in her "best interest to pursue this permanency option."

The April addendum also discussed Mother's recent participation in the Epiphany Residential Program (Epiphany), as did the social worker, Chabrika Bowers, at trial. Epiphany is a residential drug treatment program for mothers that also addresses issues of domestic violence and offers parenting classes. Although Mother had been given a referral in November 2014, she missed her initial intake appointment and did not begin treatment until early January 2015. The case manager at Epiphany reported that Mother was "not embracing the program" and her level of participation was "minimal." Mother's own individual therapist noted a "reoccurring theme for the mother to stabilize and obtain the minors back into her care," only to decompensate. The therapist told Bowers she could not support Mother's reunification with the minors because Mother's "patterns of behaviors" showed she could not meet the children's needs.

Bowers, too, pointed out Mother's noticeable "patterns of stabilizing to reunify with the kids and having the kids placed back in her care," but "after time" she "would

12

decompensate due to her substance abuse issues and mental health issues, which resulted in the kids being neglected in the areas of mental and dental, educational, as well as basic resources being provided in the home." Bowers testified Mother's current problems were the same as those in 2004; Mother had been "asked to engage in similar services . . . and she has successfully engaged in those services while the kids were not in her care, as court-ordered. [¶] Once the kids are placed in her care, we have seen the mother decompensate severely to the extent of the kids being harmed, kids being neglected, and numerous referrals coming in stating that these issues were still present."

Bowers also received a report from Epiphany that Mother exhibited mental health symptoms but refused to undergo a medication evaluation. Her therapist was concerned about her "mental health stability," and her psychiatrist reported that she was still suffering from "auditory hallucinations with strong command voices." Mother's long-term therapist reported to Bowers that she had been ready to close Mother's case in January 2015 due to "lack of contact" and missed appointments. Mother did not actually engage in renewed therapy until late March 2015, and there were concerns about whether she had "active psychosis" and whether her medication was "able to suppress the hallucinations." Mother, however, was unwilling to try a new medication.

The April 14 addendum report recounted Mother's "extensive history of Child Welfare involvement," noting that "[o]ver the last 11 years" Mother had been given family preservation, reunification and maintenance services. "Since 2004 the mother has not had the minors in her care without the Agency's involvement. The minors have suffered neglect, physical and emotional abuse that has left them traumatized, caused by the mother exposing the minors to her unhealthy relationships, substance abuse, and mental health issues. The [three older children] have experienced the most turmoil as they [have] been in and out of Foster Care due to the mother's inability to maintain a healthy home environment."

Mother presented the testimony of Toshia Webster, the program coordinator at Epiphany. Mother had been housed in her unit for four months. Webster testified that Mother made a "slow start" into recovery for the first two-and-a-half months. Within the

13

past seven weeks, however, she had become more "grounded," was making a greater effort in recovery, and was following the rules and participating in groups. She attended at least three NA meetings per week, but had not yet found a sponsor. Webster had no concerns about Mother's mental health as long as she continued taking her medication.

At the conclusion of testimony, Mother's attorney acknowledged she had received 31 months of family maintenance services but argued "[t]he past is the past" and urged the court to consider the efforts Mother had made since November 2014, pointing to the restraining order she obtained against A.R.'s and N.R.'s father, her residence at Epiphany, and her more serious efforts at recovery for the past seven weeks. If she were not given more services, he warned, the siblings would be "scatter[ed] . . . to the wind." Attorneys for A.S., A.R. and N.R. argued against providing further services to Mother.[6] Counsel for the twins, on the other hand, supported giving Mother more services, placing the siblings together, and helping the twins get back into school.

On May 14, 2015, the court opened the hearing by reciting that it had reviewed "all the files in this matter, which are considerable."[7] Under section 361.5, subdivision (b)(10), the court considered the "duration, the extent and the context of the reasonable efforts," but "looking at the history of this family and its interactions with the child welfare system" it concluded Mother had not made reasonable efforts to avoid bypass of further services. The court ordered the children removed from Mother's home based on her "continuing struggles with respect to substance abuse and mental health challenges." The court found by clear and convincing evidence that the Agency had complied with the case plan by making "reasonable efforts to make it possible for [the children] to return

---

[6] Attorneys for A.S. filed a trial brief supporting the Agency's recommendation that Mother be denied further reunification services and requesting that the court set a hearing under section 366.26. The twins' attorney, however, did not agree with A.S.'s position.

[7] The November 2014 status review report was admitted into evidence at the hearing, as were the addendum reports prepared in January and April 2015. We interpret the court's remarks at the opening of the May 14 hearing to indicate it took judicial notice of all the reports in the file. (Evid. Code, § 452, subd. (d).)

14

home safely" and that the four older children would remain dependents and N.R. would be declared a dependent. It found by clear and convincing evidence that Mother had failed to reunify with the three older siblings, that reunification services were previously terminated, and that Mother had not subsequently made a reasonable effort to treat the problems that led to the removal. It therefore denied Mother further reunification services under section 361.5, subdivision (b)(10). The court found returning the children to Mother's home would be detrimental and ordered the children to remain in foster care. It found there was not a substantial probability the children could be returned home within the maximum time allowed and set a hearing under section 366.26 for the three older children for September 16, 2015.

## DISCUSSION

### I. Mother's contentions

Mother's petition presents a bare bones argument in favor of allowing her more reunification services for her three oldest children. Aside from a recitation of the facts beginning in November 2014, the full text of the argument on Mother's behalf reads as follows, "Petitioner argues she has made and continues to address by reasonable efforts the reasons that lead [*sic*] to the removal of her children. She believes it is in their best interest for Petitioner to receive reunification services. She is asking this Court to order reunification services."[8] She provides no detail in support of the claim that she has made reasonable efforts to address her parenting deficits following the earlier termination of services. Nor does her petition acknowledge the long history of the Agency's involvement with her family. Thus, the petition is decidedly unhelpful to us in resolving the issues in this complicated case.

---

[8] We shall treat this letter brief as a challenge to the sufficiency of the evidence to support the juvenile court's findings under section 361.5, subdivision (b)(10) and as a claim of abuse of discretion under subdivision (c) of that section. We remind counsel, however, of his duty to support his contentions with reasoned argument and citation to authority. (Rule 8.452(b)(2); *Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175, 1196, fn. 2.)

The petition cites *In re G.L.* (2014) 222 Cal.App.4th 1153 (without discussion) as its sole legal authority, evidently for the proposition that a court may, in its discretion, order reunification services for a parent under section 361.5, subdivision (c),[9] even if bypass of such services would ordinarily be called for under subdivision (b). (*Id.* at pp. 1164–1165.) We interpret counsel's citation as an invocation of the "best interest of the child" exception under section 361.5, subdivision (c).[10] In addition to the Agency's response to the petition, A.S. filed a brief opposing Mother's petition.

## II. Summary of our conclusions

Section 361.5, subdivision (a) generally provides that in dependency cases parents shall be entitled to reunification services "whenever a child is removed from a parent's . . . custody," "[e]xcept as provided in subdivision (b)." Section 361.5, subdivision (b) provides a detailed list of circumstances in which such services need not be provided, commonly known as "bypass" provisions. The bypass provisions constitute a legislative acknowledgement that " 'it may be fruitless to provide reunification services under certain circumstances.' " (*In re G.L.*, *supra*, 222 Cal.App.4th at p. 1164; accord, *Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 95–96 (*Cheryl P.*).) The parties initially briefed this case under section 361.5, subdivision (b)(10), which allows the court to bypass services to a parent who has previously had a sibling of the child removed from

---

[9] That subdivision reads in pertinent part: "The court shall not order reunification for a parent or guardian described in paragraph (3), (4), (6), (7), (8), (9), (10), (11), (12), (13), (14), (15), or 16 of subdivision (b) unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child."

[10] Mother's counsel did not specifically argue for application of this subdivision at the contested hearing, and the issue may therefore be deemed forfeited. (See *In re Dakota S.*, *supra*, 85 Cal.App.4th at p. 502.) Furthermore, subdivision (c) itself limits its application to cases "in which this section [i.e., § 361.5] applies." Because we conclude section 361.5 does not apply, we need not discuss subdivision (c) at all. But even if that subdivision had applied, the burden would have been on Mother to show that further reunification services were in the "best interests" of her children. (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227.) It is axiomatic, however, that "[t]he best interests of the child are not served by merely postponing his [or her] chance for stability and continuity and subjecting him [or her] to another failed placement with the parent." (*Id.* at p. 1229.)

his or her care, has failed to reunify with that sibling, and has not subsequently made a "reasonable effort to treat the problems that led to removal of the sibling." [11] Indeed, that is the provision under which the court below ruled. Counsel for all parties also operated throughout the proceedings on the assumption that section was properly invoked. We conclude, however, that the court gave Mother more consideration than she was entitled to under the statutory scheme.

Having tentatively concluded Mother had received all the services to which she was entitled for these three children under section 361.5, subdivision (a)—and that a bypass finding was therefore unnecessary under subdivision (b)—we invited further briefing by the parties and stayed the September 16 hearing to accommodate such briefing. The Agency responded, acknowledging that section 361.5 and its bypass provisions have no application here. Counsel for Mother did not respond.

We now hold that Mother was not entitled to further services under section 361.5, subdivision (a), and therefore the court was not required to undertake a bypass analysis under section 361.5, subdivision (b). No party objected to the court's use of section 361.5, subdivision (b)(10); therefore, any objection based on the court's use of the wrong statute has been forfeited. (See *In re Dakota S.* (2000) 85 Cal.App.4th 494, 501–502.) And although the court made its findings in accordance with an incorrect standard unduly favorable to Mother, we find it virtually inconceivable that a result more favorable to Mother would have obtained in the absence of the error. The court's error was therefore

---

[11] That subdivision reads in pertinent part: "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: ¶ . . . ¶ (10) That the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian described in subdivision (a) and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian."

17

also harmless. Setting a hearing under section 366.26 was proper in the circumstances, and the hearing should now go forward despite our initial stay order.

**III.    The court erroneously relied on section 361.5, subdivision (b)(10) in denying further reunification services to Mother.**

We begin with a general overview of the dependency statutory framework. At the outset of a dependency proceeding, the emphasis is on preservation of the family due to the strong fundamental interest parents have in the care, custody, management and companionship of their children, which is recognized as "a compelling one, ranked among the most basic of civil rights." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306; see *In re G.W.* (2009) 173 Cal.App.4th 1428, 1435–1436 (*G.W.*).) "Likewise, natural children have a fundamental independent interest in belonging to a family unit [citation], and they have compelling rights to be protected from abuse and neglect and to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child. [Citation.] The interests of the parent and the child, therefore, must be balanced." (*In re Marilyn H.*, *supra*, at p. 306.) Our Juvenile Court Law attempts to accommodate these sometimes competing interests by shifting the emphasis of the proceedings over time from the goal of preserving the family at the outset to that of protecting and promoting the best interests of the child if efforts at reunification produce unsatisfactory results or drag on too long. (*Id.* at p. 307; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *G.W.*, *supra*, at pp. 1435–1436.)

In line with these shifting goals, subdivision (a) of section 361.5 contains a series of time limitations on "child welfare services" that may be offered in a dependency proceeding, with a 12-month presumptive period for children age three or older, and an 18-month maximum.[12] (§ 361.5, subd. (a)(1)(A) & (3).) In the present case, prior to termination of services in June 2008, Mother had already received all of the services available to her under section 361.5, subdivision (a). (See prior opinion of this court in

---

[12] In rare circumstances services may be extended to 24 months. (§ 361.5, subd. (a)(4).)

No. A121939.)  The intervening events did not revive her entitlement to services under that section.

Although section 361.5, subdivision (a) speaks in terms of granting reunification services "whenever" a child is removed from the parent's home, the cases have uniformly held that removal of a child from a parent's home by way of a section 387 petition does not entitle the parent to a new round of reunification services under section 361.5.  Once the reunification "clock" starts ticking upon the initial removal on a section 300 petition, it continues to run despite subsequent placement with a parent during the dependency. (§ 361.5, subd. (a)(3) ["[p]hysical custody of the child by the parents or guardians during the applicable [reunification period] shall not serve to interrupt the running of the time period"]; see, e.g., *Carolyn R. v. Superior Court* (1995) 41 Cal.App.4th 159, 164–167 (*Carolyn R.*).)

In *Carolyn R.*, 41 Cal.App.4th 159, for instance, the mother had received eight months of reunification services, followed by ten months of family maintenance services while the children were placed in her care, followed by a second removal of the children under a section 387 petition.  (*Id.* at pp. 162–163.)  The court, at disposition on the supplemental petition, found the mother had "exhausted the period for reunification," found reasonable services had been offered, denied mother's request for further reunification services, and set a hearing under section 366.26.  (*Id.* at p. 163.)  The Fifth District Court of Appeal affirmed, holding "once a court sustains a supplemental petition to remove a dependent child for a second time from a parent's physical custody, it may set the matter for permanency planning under section 366.26 if that parent received 12 or more months of reasonable child welfare services."  (*Id.* at p. 162.)

In other words, the proceedings do not return to "square one" with regard to reunification efforts.  (*Carolyn R., supra*, 41 Cal.App.4th at p. 166; accord, *G.W., supra*, 173 Cal.App.4th at p. 1440; *In re Steven A.* (1993) 15 Cal.App.4th 754, 765 [case should not have been allowed to "take on a new life when the supplemental petition was filed"].) A removal under section 387 does "not automatically trigger a new period of reunification services."  (*In re Barbara P.* (1994) 30 Cal.App.4th  926, 933 (*Barbara P.*)

19

[subsequent petition under § 342].)  The reason is rooted in "the state's interest in assuring that minors whose parents cannot provide them with a stable home have another opportunity for such a home life within a reasonable time." (*Id.* at p. 934.)  Thus, when the court removed the children from Mother's care based on the November 2014 section 387 petition, it did not trigger presumptive entitlement to a new series of reunification services for Mother under section 361.5, subdivision (a).  And since Mother had no entitlement to services under subdivision (a), it was not necessary for the court to make bypass findings with respect to these children under subdivision (b).

By erroneously considering the matter under section 361.5, the juvenile court used a more generous standard than that to which Mother was entitled.  Specifically, it considered whether Mother had made a reasonable effort over the years to address the problems that led to the children's removal.  (§ 361.5, subd. (b)(10).)  The court was not required to consider this factor at all, and even if it had found Mother had made a reasonable effort, that would not have entitled her to additional reunification services.  And finally, even if section 361.5, subdivision (b)(10) had been applicable, the court's finding of no reasonable effort by Mother was supported by substantial evidence.  (See *A.A. v. Superior Court* (2012) 209 Cal.App.4th 237, 242; *R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914; *Cheryl P.*, *supra*, 139 Cal.App.4th at p. 96.)

## IV.     The court had discretion to order further reunification services under section 366.3, but it did not abuse its discretion in denying Mother further services.

We next consider whether Mother might have been eligible for additional reunification services under a different statute, and if so, whether a remand is necessary to allow the trial court to apply the correct statute or standard.  We find no specific statute authorizing reunification services in the post-permanency phase for a parent whose child has been removed from the parent's home pursuant to a section 387 petition.  The parties have referred us to neither statutory nor case law resolving this issue.  Generally speaking, however, post-permanency reunification services are not entirely foreclosed to parents whose children have been placed outside the home as part of a permanent plan,

20

but whose parental rights have not been terminated.[13]  Rather, if a parent can show "further efforts at reunification are the best alternative for the child," then the court is authorized to grant six more months of reunification services and up to six months of family maintenance services. (§ 366.3, subd. (f).)[14]  That standard governs the availability of reunification services on periodic review in the post-permanency phase when the child has been placed outside the parent's home.  (§ 366.3, subds. (d), (f).)

In response to our request for supplemental briefing, the Agency urges us to find that Mother was not, under any circumstances, eligible for further reunification services, arguing that the court's "only option" at the disposition of the section 387 petition was to set a hearing under section 366.26.  Adopting that suggestion would, of course, lead to denial of the petition without need of further discussion.

In support of that position, the Agency cites *G.W.*, *supra*, in which the Fifth District explained, "An analysis of the chronological stage of the case would have established that mother already had received 18 months of reunification services, and services for both fathers had been terminated.  At this stage of the case, *the only option left for the juvenile court at the dispositional hearing [on a section 387 petition] was to*

---

[13] A petition under section 387 may be used to remove a child from a parent or other non-parental custody:  "An order changing or modifying a previous order by removing a child from the physical custody of a parent, guardian, relative, or friend and directing placement in a foster home, or commitment to a private or county institution, shall be made only after noticed hearing upon a supplemental petition."  (§ 387, subd. (a).)

[14] Subdivision (f) of section 366.3 reads:  "Unless their parental rights have been permanently terminated, the parent or parents of the child are entitled to receive notice of, and participate in, those hearings [under subdivision (d)].  It shall be presumed that continued care is in the best interests of the child, *unless the parent or parents prove, by a preponderance of the evidence, that further efforts at reunification are the best alternative for the child. In those cases, the court may order that further reunification services to return the child to a safe home environment be provided to the parent or parents up to a period of six months, and family maintenance services, as needed for an additional six months in order to return the child to a safe home environment.*  On and after January 1, 2012, this subdivision shall not apply to the parents of a nonminor dependent."  (Italics added.)

21

*proceed to the section 366.26 selection and implementation hearing* as required by rule 5.565(f). The failure of the juvenile court to do so was error." (*G.W.*, *supra*, 173 Cal.App.4th at p. 1441, italics added.)

Rule 5.565(f), which governs disposition of a section 387 petition, reads: "If a dependent child was returned to the custody of a parent or guardian at the 12-month review or the 18-month review or at an interim review between 12 and 18 months and a 387 petition is sustained and the child removed once again, the court must set a hearing under section 366.26 unless the court finds there is a substantial probability of return within the next 6 months or, if more than 12 months had expired at the time of the prior return, within whatever time remains before the expiration of the maximum 18-month period." But this rule, by its terms, applies only through the 18-month review and not in the post-permanency period. In this case the children were not returned to Mother until a much later stage of the proceedings.

For the same reason, the "only option" rule of *G.W.* also does not apply to our circumstances. Indeed, both *G.W.* and Rule 5.565 are distinguishable in that they govern situations in which the parent has exhausted reunification services available under section 361.5, but no permanent plan has yet been selected for the child.[15] (*G.W.*, *supra*, 173 Cal.App.4th at p. 1434.) The denial of reunification services at that point merely halts reunification efforts until a hearing may be had under section 366.26 and a permanent plan adopted. Depending on which permanent plan is selected, the parent may again qualify for reunification services thereafter if the permanent plan is guardianship or long-term foster care and the initial placement proves to be less than optimal. (§ 366.3, subds. (b) & (f).) The temporary cessation of reunification services does not necessarily eliminate the parent's ultimate eligibility for further reunification services in the future. (*Ibid.*) Once a permanent plan is selected, however, the case moves into the post-

_____

[15] In *G.W.*, the juvenile court had appointed the children's stepgrandmother as their guardian at the disposition of a section 387 petition, without scheduling a section 366.26 hearing. (173 Cal.App.4th at p. 1438.) The Court of Appeal held this was error. (*Id.* at pp. 1439, 1445.)

permanency stage, and section 361.5 has no further operation. If a plan other than adoption is selected, and parental rights are not terminated, the availability of reunification services is determined thereafter under section 366.3, not section 361.5.[16] (See § 366.3, subds. (b), (f).)

Because we are at a far more advanced stage of the proceedings, the "only option" rule of *G.W.* and Rule 5.565 has no direct application here. The case before us entered the post-permanency phase years ago, when a guardianship was established as the permanent plan but later failed, thereby bringing section 366.3 into play. The permanent plan next selected was long-term foster care, although Mother was later allowed to have the children placed with her under Agency supervision. So far as we can discern, when Mother received ongoing family maintenance services while the children were in her care, the court orders must have been issued under section 366.3, subdivision (f).

The correct approach in considering further reunification services following removal of a child from a parent under section 387 is one that would allow such services to be provided to the same extent they would be available under the periodic status review statute applicable at the same stage of the proceedings. This approach, developed by the Fifth District in *Carolyn R.*, advises us to identify the applicable reunification services provision within the code based on the stage of the dependency in which the supplemental petition was filed, thereby placing statutorily-based limits on the exercise of the court's discretion to order further services.

"[T]he court determines at what chronological stage of the 12- to 18-month period the case is for reunification purposes *and then proceeds pursuant to section 366.21 or section 366.22 as appropriate*." (*Carolyn R.*, *supra*, 41 Cal.App.4th at p. 166, italics added.) Employing that technique, if the child was three years or older at initial removal,

---

[16] Even if the permanent plan for the child was originally set as adoption, if the child has not been adopted within three years after parental rights were terminated, the court may reinstate parental rights if that appears to be in the child's best interests. (§ 366.26, subd. (i)(3).) If parental rights are reinstated, the parent may again seek reunification services under section 366.3, subdivision (f). (Seiser & Kumli, California Juvenile Courts Practice and Procedure (2015) § 2.171[5][h][ii], p. 2–605.)

23

and if the parent has received less than 12 months of reunification services, reunification services will be resumed upon disposition of a supplemental section 387 petition. (*Ibid.*) Likewise, reunification services may be resumed if the case has "passed the 12-month mark but there is a substantial probability the child will be returned within 18 months of the date the child was originally removed from the parent's physical custody." (*Ibid.*, citing § 366.21, subd. (g)(1).)

Under the Fifth District's methodology, the courts essentially *borrow* from the periodic review statutes their provisions relating to reunification services and apply those provisions in determining a parent's entitlement to further reunification services when ruling on a supplemental petition under section 387. The standard of review using this method is the abuse of discretion standard. (*Carolyn R.*, *supra*, 41 Cal.App.4th at pp. 166–167.) This approach also appears to be generally consistent with Rule 5.565, although neither *Carolyn R.* nor the rule addresses the availability of services in the post-permanency period.

The same sort of borrowing technique has also been used more generally in determining whether reunification services should be provided in the post-permanency period when a dependent child is removed from a *non-parent's* home. In *In re R.N.* (2009) 178 Cal.App.4th 557, 560–566 (*R.N.*), the appellate court held that a father whose daughter had been placed in a guardianship with her paternal grandparents in 1996 could qualify for reunification services under section 366.3, subdivision (f) when the last surviving grandparent died in 2008. The issue arose on an aunt's petition under section 388 to become the successor guardian. Although the 18-month reunification period had long since expired, the Court of Appeal held the juvenile court erred in failing to consider the father's eligibility for reunification services if he could establish "by a preponderance of the evidence, that reunification is in the child's best interests." (*Id.* at pp. 564–566; see fn. 14, *ante*.) In *R.N.*, the issue did not arise at a periodic review hearing, but rather on the aunt's section 388 petition. The Court of Appeal held in essence that the juvenile court should have *borrowed* the reunification provision of section 366.3, subdivision (f) in ruling on the section 388 petition, and should have considered the father's eligibility

24

for reunification services under the "best alternative" standard of section 366.3, subdivision (f), even though the father had not filed his own section 388 petition at that time. (*Id.* at p. 566.) Thus, *R.N.* effectively imposed on the juvenile court a sua sponte duty to consider a parent's eligibility for reunification services under section 366.3, even where the parent had not filed a section 388 petition invoking that section. We see no reason why the analysis would be different if the petition had been filed under section 387.

The question presented here is whether section 366.3, subdivision (f) should also have been applied when the Agency filed a supplemental petition seeking to remove the children from a *parent's* home after she had exhausted entitlement to services under section 361.5 and post-permanency planning was well underway.[17] We conclude that borrowing the reunification services provision of section 366.3 for that purpose most closely corresponds to the Legislative intent underlying the statutes. We express no opinion on whether the courts must consider such eligibility sua sponte, but since Mother here requested a contested hearing on the issue of reunification services, and since the court employed the wrong statute in ruling on that issue, we consider the applicability of section 366.3 in determining whether a remand is necessary.

Granted, as the Agency points out, there is nothing in section 366.3 specifying that it applies in the present context—and nothing in section 387 indicating that section 366.3 governs the availability of reunification services when the court rules on a section 387 petition during the post-permanency period. But the same is true of sections 366.21 and 366.22, yet the courts have invoked those statutes in a similar procedural context in the

---

[17] We invited the parties to comment on whether section 366.3 plays any role in this case. In response, the Agency suggested that section 366.3 has no present application because (1) subdivision (b) of that section deals with the termination of a previously established guardianship, which applied several years ago but no longer, and (2) subdivisions (d), (e) and (f) do not apply because the court's ruling was not made during a periodic post-permanency review, but rather following removal of the children on a supplemental petition under section 387. Mother's counsel did not respond to our request.

pre-permanency phase. (*Carolyn R.*, *supra*, 41 Cal.App.4th at p. 166; *G.W.*, *supra*, 173 Cal.App.4th at p. 1436.)

Section 366.3 generally governs periodic reviews (which must be scheduled every six months) in cases where the child has been placed in long-term foster care or in a relative placement while dependency jurisdiction is continued. (*San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 885; *In re Shannon M.* (2013) 221 Cal.App.4th 282, 291.) Like this one, such cases tend to be protracted and complicated, often with fewer good options for the children's permanent placement, and undoubtedly among the most difficult for the juvenile courts.

The Agency's position that the only option legally available in this case was to deny reunification services and set a section 366.26 hearing would eliminate entirely the court's power to order reunification services in any case where the parent has twice failed to successfully reunify with a child. In such circumstances it is unlikely the court would simultaneously order the child removed from the home under a section 387 petition, and yet find return home to be the "best alternative" for the child. But given the fluidity of the factors that influence a best interests or best alternative assessment, the courts need as much flexibility as possible in determining the best options for children in these difficult cases.

We conclude the Legislature did not intend to remove all discretion to order reunification services when a parent stumbles temporarily in this period of a dependency.[18] If the parent's problems leading to the filing of a section 387 petition are truly transitory, considering return home, with provision of reunification services in the

---

[18] If the child's placement with a parent had been successful enough to result in dismissal of a dependency petition and the parent later relapsed with drugs or had other problems necessitating a second section 300 petition to protect the child, the parent would then be entitled to a full new round of reunification services. (See *Rosa S.*, *supra*, 100 Cal.App.4th at pp. 1188–1189.) On the other hand, a parent who had regained custody of a dependent child while dependency jurisdiction continued, and who similarly relapsed, would be wholly precluded from receiving reunification services under the Agency's "only option" rationale. We doubt the Legislature intended to create this disparity of treatment.

26

meantime, may in some rare instances be the child's best option. Borrowing and applying section 366.3, subdivision (f) gives the juvenile court discretion to order additional services if the child's unique circumstances suggest that is the "best alternative." By placing the burden of proof on the parent and focusing exclusively on the child's best interests, section 366.3, subdivision (f) promotes the welfare of the child and avoids interference with permanency planning, while leaving open the possibility of reunification in those rare cases where it might remain the child's best option. Thus, we hold the Fifth District's "chronological stage" identification procedure is also applicable in the post-permanency stage. A juvenile court may order additional reunification services for a parent during the post-permanency phase of a dependency, using the standard set forth in section 366.3, subdivision (f), even if the child welfare agency has filed a supplemental petition to remove the child from the parental home.

If the juvenile court had used that method, reunification services might have been theoretically available as an option, but the court should have imposed upon Mother the burden to prove that "further efforts at reunification are the best alternative for the child." (See fn. 14, *ante*.) The court did not err in failing to order such services, however, and its actual findings make a remand to apply the correct standard unnecessary. Given the facts of the case before us, we agree with the Agency that setting a section 366.26 hearing was the only realistic option in light of the court's findings on the section 387 petition. Mother's relapse with drugs was not a fleeting misstep, but a prolonged return to serious drug abuse which left her children neglected and in danger. Warning signs were evident for months before the children were removed. The court's findings implicitly rejected a "best alternative" finding, making a remand unnecessary.

V.   **The court's findings were sufficient to support denial of further reunification services, and any error in using the incorrect statute was harmless.**

At the hearing on May 14, 2015, the court found that return of the children to Mother would "create a substantial risk of detriment" to the children and a "substantial danger to the[ir] physical health." It also found its prior order placing the children with Mother had been ineffective in protecting the children. Those findings encompass an

27

implicit finding that reunification was not the "best alternative" for these children and that their best interests would not be served by postponing permanency even longer while Mother is offered services to try, once again, to achieve sobriety and to exercise responsible supervision over them. (See *In re William B.*, *supra*, 163 Cal.App.4th at p. 1229.)

We cannot overlook the fact that these three children have been dependents for nearly ten of the past 11 years. Since January 2005, they have lived in Mother's home for a total of about four years, and for less than six months without Agency supervision. From December 2006 to March 2012, they were continuously in out-of-home placement in multiple foster homes and a failed guardianship, thereby defeating the very purpose of providing a *limited* time for parents to respond to services and to provide a safe and stable home for their children. (§ 361.5, subd. (a); *G.W.*, *supra*, 173 Cal.App.4th at pp. 1435–1436.)

We have also described the detriment the children have suffered as a result of Mother's mental health issues, recurrent drug abuse, and lack of follow-through. We understand Mother has a mental disability and we do give her credit for the efforts she has made recently and for those she made to earn her children's return in March 2012. Unfortunately, there has been no lasting stability in Mother's home, and her recent efforts are overshadowed by her past failures to benefit long-term from the services offered.

Because they have been in out-of-home care for such a long time, these children—or at least A.S.—urgently need permanency. The twins, who will be 18 in January, have already been deprived of an opportunity for lasting stability in their minority. For them it is in practical terms too late to offer permanency. But providing Mother with further reunification services for their sake would be too little too late. Moreover, in light of the extensive services already provided, and under-utilized by

28

Mother, giving her yet more services would be an unwise expenditure of limited public resources.[19] (See *Cheryl P.*, *supra*, 139 Cal.App.4th at p. 96.)

Thirteen-year-old A.S. has already concluded her best interests lie outside Mother's home, where she stands a reasonable chance of achieving stability. That is understandable. As A.S.'s counsel puts it in her brief opposing writ relief, "[A.S.]'s right to permanency is paramount. Having first come to the attention of child welfare at the age of two, it is now critical that [A.S.] have the chance to finally achieve permanency instead of once again being caught in legal limbo awaiting another cycle of failed services offered to her mother. The nature and quality of [A.S.'s] relationship with her mother is unhealthy for her at this time, and she has reported on multiple occasions that she does not want to have any contact with her mother." We agree. The court's decision to deny Mother further reunification services and to set a hearing under section 366.26 must stand.

## DISPOSITION

The petition is denied on the merits. (§ 366.26, subd. (*l*)(1)(C); rule 8.452(h).) The previous order of this court staying the hearing under section 366.26 filed on August 28, 2015, is vacated. The trial court shall set a new date for the section 366.26 hearing forthwith. Our decision is final as to this court immediately. (Rule 8.490(b)(2)(A).)

_____
Streeter, J.

We concur:

_____
Reardon, Acting P.J.

_____
Rivera, J.

_____

[19] As noted, the twins' counsel favored Mother's position at trial. When the section 366.26 hearing goes forward, they will have a chance to object to termination of Mother's parental rights. (§ 366.26, subd. (c)(1)(B)(ii).)

Trial Court:                                City & County of San Francisco Superior Court

Trial Judge:                               Honorable Nancy L. Davis

Counsel for Petitioner:                     Jim Bordelon

Counsel for Respondent:                     No appearance for Respondent.

Counsel for Real Party in Interest,
San Francisco Human Services Agency:   San Francisco Office of the City Attorney
                                           Dennis J. Herrera, City Attorney,
                                           Kimiko Burton, Lead Attorney

                                           Gordon-Creed, Kelley Holl and Sugerman
                                           Jeremy Sugerman

Counsel for Real Party in Interest,
Minor A.S.:                                Legal Services for Children, Semuteh Freeman
                                           and Eliza Patten, Appointed Counsel for Minor