Filed 12/1/22  C.S. v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| C.S.,<br><br>    Petitioner,<br><br>      v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G061721<br><br>(Super. Ct. No. 19DP0590)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Isabel Apkarian, Judge.  Petition denied.

Rich Pfeiffer for Petitioner.

No appearance for Respondent.

Leon J. Page, County Counsel, Karen L. Christensen, Supervising Deputy, Deborah B. Morse, Deputy, for Real Party in Interest.

Petitioner C.S. (mother) challenges the trial court's order setting her child L.C.'s juvenile dependency matter for a permanency planning hearing under Welfare and Institutions Code section 366.26. Mother argues there was no substantial evidence supporting the trial court's finding that returning L.C. to live with her and his siblings would create a substantial risk of detriment to L.C. We disagree and deny the petition.

FACTUAL AND PROCEDURAL HISTORY

Mother has four children: J.C., Li.C., L.C., and F.C. The children were detained from mother in May of 2019 due to allegations of physical abuse after Li.C. told school personnel mother threw a brush at her and hit L.C. with a belt on his legs, causing bruises. Li.C. also reported sexual abuse committed against the children by a man who previously lived with the family but had since left, and that mother had not believed the children when they disclosed it to her. Upon detention, both L.C. and Li.C. bore marks they stated were the result of mother striking them. Three of the four children told a social worker they wanted to return to mother; L.C. indicated he wanted to stay away and only visit with mother.

Mother reported that L.C. and Li.C.'s behavior was challenging and made it difficult to take care of the children. L.C.'s therapist diagnosed him with various behavioral disorders. Both children engaged in problematic behavior while detained from mother. L.C. ran away from and assaulted staff, while Li.C. made "self-harm statements" and kicked staff who were attempting to prevent Li.C. from engaging in self-harm. Li.C.'s clinician also diagnosed her with major depressive disorder and other related disorders.

At the 18-month review hearing, the trial court terminated reunification services for mother and found a continuing substantial risk of detriment to the children if

2

they were returned to mother. However, the trial court declined to set a hearing under Welfare and Institutions Code section 366.26 because the children were not proper subjects for adoption and had no one willing to accept legal guardianship. Accordingly, the children continued in foster care with the long-term goal of placement with a fit and willing relative.

In March 2021, Li.C. was placed with mother for a 60-day trial visit. During this same period, L.C. began declining to attend visits with mother. At the conclusion of the trial visit, Li.C. stayed with mother under a family maintenance plan. During subsequent visitation, the children (now including L.C.) began behaving poorly and engaging in conflict with one another—particularly Li.C. and L.C. L.C.'s behavior at school began deteriorating at the same time.

In September 2021, L.C. told a social worker he was doing well in his placement with mother's relative. He told the social worker he would like to be adopted by his caregivers and expressed concerns about returning to live with mother. The following month, J.C. and F.C. began overnight weekend visitation with mother. L.C. did not participate in overnight visitation because of his disruptive behavior. In November, J.C. and F.C. began a 60-day trial visit with mother. L.C. again advised the social worker he would like to be adopted by his caregivers, but also indicated he would like to visit mother's home.

On December 23, 2021, L.C. visited mother and his siblings, which went well. A second visit, December 29, 2021, did not go as well—L.C. and F.C. fought and L.C. began throwing things and cursing at the staff.

At the conclusion of their 60-day trial visit, J.C. and F.C. returned to mother's custody. L.C. reported being torn between a desire to return to his mother and a desire to stay with his caregivers. At this point, the trial court revised its permanent plan, finding the plan of placement with a fit and willing relative was no longer appropriate.

3

The trial court set a new hearing for August of 2022 to determine the appropriate permanent plan for L.C.

Mother and L.C. had positive visits, some of which included the other children, including Li.C. While the visits involved some conflict between L.C. and Li.C., mother successfully redirected the children and avoided any "significant acting out behavior."

As the permanency planning hearing approached, L.C.'s court appointed special advocate reported L.C. consistently expressed a desire to stay with his caregivers, and only to visit his mother and siblings. Mother expressed concern to the social worker regarding difficulties with Li.C.'s behavior. Mother also reported being too busy with services and responsibilities to take the children to certain mental health and behavioral services and feeling overwhelmed by stress. L.C. himself reported a desire to stay with his caregivers and to be adopted. The caregivers, meanwhile, reported they perceived an increase in L.C.'s negative behaviors at school correlated with efforts to reunify L.C. with mother. The caregivers expressed a desire to adopt L.C., based on L.C.'s requests they do so. In its final report, real party in interest Orange County Social Services Agency (SSA) recommended termination of reunification services and scheduling a Welfare and Institutions Code section 366.26 hearing.

At trial, the parties stipulated that J.C., F.C., and Li.C., if called to testify, would indicate they are happy in mother's home and want L.C. to return home. L.C. testified visitation with his mother was going well, but that he did not want to return to his mother's home because she "used to hit [him] and she used to do drugs." He later clarified that by "drugs" he meant alcohol and cigarettes. L.C. testified his mother told him at visitation that she would change and would no longer do these things, but L.C. did not believe her. He also testified that the last visit that included Li.C. had gone badly because they started fighting.

4

L.C. testified he enjoyed visiting with his mother and wanted more time with her, including visits to her house, and that he had previously skipped some visits because he wanted to play with his cousin's friend at the park instead. He insisted that, though he missed his brother and sisters, he nevertheless did not want to go back to his mother, even if it meant he would be reunited with his siblings. He did, however, indicate that he might, at some time in the future, want to live with his mother again.

The social worker testified mother had made progress by keeping the children safe from further sexual abuse and not committing any additional domestic violence, but that she had struggled with addressing difficult behavior in the home, especially with respect to Li.C. The social worker also testified she was concerned that some counseling and behavioral health services had not been continued for the children, especially for F.C., after they were returned to mother's care. According to the social worker, the children historically had a difficult time controlling their behaviors when all four were present and had "really negative interactions with each other." The social worker believed L.C.'s behaviors would become more problematic if he were returned to mother's care, particularly because she was somewhat inconsistent with the other children about ensuring they received their medications. Before the social worker would condone L.C.'s return to mother's care, she testified she would need to see productive visitation with all four siblings present, with mother managing their behaviors.

On cross-examination, the social worker admitted mother had completed a 52-week child battery program, had successfully drug tested for approximately 16 months, with all negative results, and had completed multiple rounds of counseling and a personal empowerment program. The social worker also admitted that visits had generally gone well between mother and L.C., that mother was "very attentive" and "very nurturing" to L.C., and that L.C. "like[d] to see her." The social worker gave several reasons for SSA's recommendation: (1) L.C. did not want to return to mother's care; (2) L.C.'s negative behaviors escalated in the presence of his siblings; and (3) there were

5

concerns regarding mother's ability to follow through with supportive services for L.C. in light of her inconsistency in doing so with the other siblings.

Mother testified she wanted L.C. returned to her care. She testified she had asked for her visits with L.C. to be unsupervised, but the social worker refused. From mother's perspective, visits had gone well, involving hugs and play. She tried to speak with L.C. by phone daily but was only permitted to talk to him once a week, which she testified was caused by the caregiver. Mother complained she was on her guard at supervised visitation and did not talk much to L.C. because the supervisors had previously reported that she had yelled at L.C. Conjoint therapy had not worked; L.C. arrived upset and did not want to talk. Mother also indicated she finished all parts of her required case plan services and had not used alcohol or illegal drugs. Mother had worked out her prior issues with housing and was able to provide for L.C. Mother was also willing to continue services and would commit to having L.C. continue therapy and take his medication.

Mother testified she believed she could supervise all four children; she would separate them if they began to fight or cause issues. Mother denied ever hitting her children after the initial incident in May 2019.

In closing argument, counsel for SSA conceded mother had completed "the majority of" her case plan and acknowledged SSA had recommended the return of the three other children. Counsel for SSA also conceded mother's sincerity in her expressed love for L.C. and her desire to keep him safe and well cared for. However, SSA's counsel argued mother lacked the ability to accomplish these things, mainly because of her existing difficulties taking care of F.C., Li.C., and J.C. Counsel pointed out that mother told the social worker she was too busy to get Li.C. certain additional social services, and that mother had not been able to manage L.C. and Li.C. when they were together even for supervised visits. Counsel emphasized the significant parenting challenges presented by L.C. and argued that though mother might be willing, she was

6

unable to ensure that L.C. would receive the medications and services he needs. Lastly, counsel argued the other three children had all expressed a desire to return to mother, while L.C. had not.

Mother's counsel argued SSA had not met its burden of showing a risk of detriment to L.C. Mother's counsel characterized mother's difficulties handling the behavior of the children, including the aggressive interactions between L.C. and Li.C., as not safety concerns, but instead "nothing more than regular parenting struggles of a single mother who is working hard to provide for her children, teenage children, who are going to tease each other, who are going to fight, who are going to have, quote/unquote, 'aggressive tendencies towards each other.'" Mother's counsel also argued reasonable services may not have been provided because of SSA's refusal to permit proper visitation and to provide conjoint therapy for mother and L.C., and potentially for L.C. and Li.C.

L.C.'s counsel also argued that though mother had "done her best," "her plate [was] full." He requested that the court adopt SSA's recommendation.

The trial court agreed. The court found mother credible but concluded she would not be able to care for L.C. given his challenges and those of his siblings. The trial court found both that it was in L.C.'s best interest to adopt SSA's recommendation and that SSA had proven by a preponderance of the evidence that there existed a substantial risk of detriment to L.C. if he were returned to mother. The trial court also found reasonable services had been provided. The trial court adopted SSA's recommendation, but also approved continuing funding for therapy for mother and L.C., as well as for conjoint therapy for mother, L.C., and his siblings, or any combination thereof.

Mother filed a timely notice of intent to file a writ petition, and a timely petition seeking a writ of mandate. We issued an order to show cause, to which SSA filed a return. Oral argument was waived.

DISCUSSION

In her writ petition, mother argues the trial court erred in finding that returning L.C. to mother would create a substantial risk of detriment to L.C.'s safety or emotional well-being. SSA contends substantial evidence supports the trial court's decision. SSA also contends the appropriate standard is not "substantial risk of detriment," but instead is a general "best interest" determination based on Welfare and Institutions Code section 366.3, subdivision (f).

On the initial procedural question, SSA is correct. As described above, in November 2020 the trial court conducted the 18-month review hearing and found a substantial risk of detriment to L.C.'s safety or emotional well-being. Mother does not (and, at this stage, likely cannot) challenge this finding. At that same hearing, the trial court invoked Welfare and Institutions Code section 366.21, subdivision (g)(5), finding L.C. was not a proper subject for adoption and had no one willing to accept legal guardianship. He was therefore placed into long-term care while dependency jurisdiction continued. "Section 366.3 generally governs periodic reviews (which must be scheduled every six months) in cases where the child has been placed in long-term foster care or in a relative placement while dependency jurisdiction is continued." (*D.T. v. Superior Court* (2015) 241 Cal.App.4th 1017, 1040)

At such a hearing, the trial court's decisions are governed by Welfare and Institutions Code section 366.3, subdivision (f), which provides, "It shall be presumed that continued care is in the best interests of the child, unless the parent or parents prove, by a preponderance of the evidence, that further efforts at reunification are the best alternative for the child." The trial court need not find anew a substantial risk of

8

detriment to L.C. at each permanency review hearing after having made that finding at the initial permanency planning hearing in November 2020. (*Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1145.) Instead, section 366.3, subdivision (f) "plac[es] the burden of proof on the parent and focus[es] exclusively on the child's best interests." (*D.T. v. Superior Court*, *supra*, 241 Cal.App.4th at p. 1041.) The trial court's determination on this point is reviewed for abuse of discretion. (See *In re J.C.* (2002) 104 Cal.App.4th 984, 993; *Maribel M. v. Superior Court* (1998) 61 Cal.App.4th 1469, 1478.)

We find no abuse of discretion. L.C.'s pattern of regressing into negative behaviors upon increasing visitation with mother and his siblings and desire to stay with his caregivers both supported the trial court's determination, as did mother's past pattern of failing to ensure his siblings continued receiving medication and supportive services after being placed with her. Mother's admission to the social worker that she was struggling to manage the responsibilities associated with caring for L.C.'s three siblings and felt overwhelmed by stress also supported the trial court's decision.

This is a difficult case. Mother's commitment to her children, including L.C., is evident by her completion of her case plan, her testimony, and her perseverance over more than two years in pursuing custody. But the difficulties mother experienced in caring for L.C. along with his siblings, even in short visits, are also apparent from the record. Choosing the best path here was an unenviable task. The trial court, hearing the evidence firsthand and being most familiar with the participants and events, was in the best position to make this determination, and the record before us shows the trial court treated this responsibility with the care and attention it deserved.

DISPOSITION

The petition for writ of mandate is denied.  The order to show cause is discharged.


SANCHEZ, J.

WE CONCUR:


MOORE, ACTING P. J.


MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

10