Filed 9/27/21  In re J.S. CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.S., a Person Coming Under the Juvenile Court Law. | |
| BARBARA S., Plaintiff and Appellant, v. ALAMEDA COUNTY SOCIAL SERVICES AGENCY, Defendant and Respondent. | A162070 (Alameda County Super. Ct. No. JD-021451-03) |

Barbara S. (mother), adoptive mother of 15-year-old J.S., appeals an order after a 12-month review hearing that terminated reunification services and limited her right to participate in educational decisions for J.S. The juvenile court found that Alameda County Social Services Agency (the agency) had offered reasonable services, and held that it could not find a substantial probability that J.S. could return to mother's custody within 18 months of removal. She contends that no substantial evidence supports those rulings, mainly because the agency prevented her from repairing her relationship with J.S. when it acquiesced in his refusal to visit. We disagree and will affirm.

1

**Factual and Procedural History**

J.S. was born in 2005; mother adopted him when he was 18 months old. Both are African-American. Mother, who worked as a teacher "for most of 40 years" and deemed herself a "senior citizen," lives with her adult son Gabe and teenage adopted daughter P.S. (The record does not specify mother's age, but the jurisdiction report indicates that in 2011 she described herself as 70 years old.)

Mother and J.S. had prior difficulties that led to a 2014 proceeding in which she said that she could no longer care for him because of his aggression and that she would not seek reunification and would relinquish parental rights. However, the two were reunited in 2015.

These proceedings began in October 2019 when mother declined to pick J.S. up from Willow Rock mental health center, where he had been committed for approximately 14 days (Welf. & Inst. Code,[1] § 5150) after an altercation in her home. According to J.S., the incident began when he refused mother's demand to give her his laptop; escalated when Gabe tried to enforce the demand; and culminated in J.S. kicking Gabe, Gabe bending back his finger, slamming him to the floor, and trying to take his musical instruments, and J.S. waving and throwing a knife at Gabe. Mother denied that Gabe touched J.S. and said he only got near his instruments.

Mother did not visit J.S. in Willow Rock and, upon his release, said that she did not think he could live safely in her home, given a history of violent incidents. Mother also said that J.S. had stolen from her and Gabe, was always angry, and insulted and disrespected her.

---

[1] All undesignated statutory citations are to the Welfare and Institutions Code.

For his part, J.S., who has suffered depression and suicidal ideation, did not want to return, saying he did not feel safe with mother or Gabe and that she had called him "stupid, crazy, and/or mental." Mother denied those allegations, but P.S. confirmed them. J.S. also said that Gabe physically abused him, which mother denied.

The agency placed J.S. in a foster family agency (FFA) home. At a jurisdictional hearing on November 21, 2019, the juvenile court found him a dependent (§ 300, subd. (g)) and ordered the agency to provide reunification services and to arrange visitation "as frequently as possible consistent with [J.S.]'s well-being." It approved a case plan requiring mother to "work on building her relationship with [J.S.]" by asking about his day, offering to listen when he is upset and taking time before responding, and doing enjoyable activities together. The plan called for J.S. and mother to attend family therapy to regain mutual trust.

As noted in an April 20, 2020, report for the six-month review hearing, mother refused referrals for individual or family therapy or therapeutic visits, insisting there was no need for her visits to be supervised. J.S. was willing to have one visit with mother, and a social worker told him she would arrange it once he was ready. Mother complained of the agency letting J.S. "call the shots" despite not knowing what is best for him.

On March 5, the two had a supervised visit. J.S. stayed as far away from mother as possible, asked why she wanted to visit after not visiting in Willow Grove, and began yelling about events from his childhood. Mother seemed not to understand why J.S. said the things he did, stating repeatedly that she had done all she could to give him a good life. The social worker suggested that therapeutic visits or family therapy might help the two understand one another, but mother refused. At the end of the visit, J.S. left quickly without saying goodbye.

J.S. agreed to speak with mother by phone; in six weeks after the March visit, they had two calls. The social worker asked that calls increase to weekly, with the goal of facilitating more visitation. J.S. insisted that he would not return to mother's care, as he was very angry at her about how he was treated growing up, her failure to protect him from Gabe, and her having made him feel as if something were wrong with him. The report added that J.S. was struggling with motivation to do school work but was a talented musician active in a school band.

On April 15, the report states, mother again declined family therapy, as she did not trust a clinician who might be younger or from another cultural background to grasp the situation. (At the hearing, mother denied this statement.) On April 16, she agreed to attend a child-and-family-team meeting the next day, but when the team called her repeatedly, she did not answer.

At the six-month review hearing on May 12, the court found that the agency had offered reasonable services and that mother had made minimal progress and had not participated in court-ordered treatment. It set a 12-month review hearing on October 28.

On September 30 the agency filed a report recommending that services be terminated. For most of the period since April, it stated, mother had refused individual therapy. In June, she and a social worker discussed arranging sessions with Cheryl Cranshaw, with whom mother had worked before. Mother thought Cranshaw would offer family therapy focused on J.S.; the social worker expected her to provide individual therapy to prepare mother for joint therapy. When the miscommunication became clear, mother at first reiterated her refusal to have individual therapy but then, on June 30, agreed to do so. However, she did not begin sessions at that time.

Mother said in early June that calls with J.S. had been sporadic and that she felt he should call her; the social worker told her to call weekly "to show

that she is trying, even if [he] does not want to talk." Asked three weeks later how the calls were going, mother said "she needs to ask [P.S.] for [J.S.]'s number, and that she has not called in a while but will call him."

In July, mother attended a meeting about changing J.S.'s placement to an FFA home in Stanislaus County. She refused to drive 86 miles to the Tracy FFA office for visits. FFA social worker Edward Lubembe offered to drive J.S. to Pleasanton for visits, but mother did not want Lubembe—whom she called "Mr. La Boom Boom," and whose accent she mocked—to supervise her visits. She asked that J.S. be moved to a group home in San Francisco, but was told that doing so would violate the agency's policy of placing children in the least restrictive appropriate setting.

On August 1, mother called J.S. to get his new address so she could send money and items, including one of his musical instruments. Mother left the social worker a message asking if she could visit the foster home but, without awaiting a response or contacting the foster family, had Gabe drive her there. Upon seeing Gabe, J.S. became upset and refused to leave the house to see mother. Mother complained to the agency that J.S.'s foster mother had not let her see J.S., and that J.S. was in a white community she found racist. She asked that he be put in a group home in Oakland. A social worker again explained the least-restrictive-setting policy and asked if mother could recommend local friends or relatives for placement; she could not.

On August 11 mother refused to have supervised visits or to work with a parent partner from J.S.'s mental health team. But on August 21, she said she would work with Lubembe to arrange a supervised visit as soon as possible. As to the August 1 incident, mother said that Gabe had come to the foster home because she needed him to drive her, but that if he did so again she would ensure that he would not be seen by J.S. Mother refused again to work with J.S.'s mental health team or to attend a team meeting that day.

5

On August 27, J.S. said he did not want to return to mother, that she "does not care about him," and that she will never change. J.S. also stated that mother had said, during a recent call, that if he did not stop being disrespectful he would "get slammed," and that mother had told him not to call her. In a September 4 conversation with the social worker, Mother denied making the "get slammed" comment and said that she wanted J.S. to call, but not because he is forced to do so. The report states that the social worker responded by telling mother that, while calls may have to be strongly encouraged at first, if mother is engaged and supportive, J.S. might begin to look forward to them.

Lubembe arranged a visit in a Pleasanton park on September 12. J.S. was hesitant to go and disappointed that the first person he saw was Gabe, who had driven mother. After Gabe left, J.S. engaged in the visit but did not believe that mother was excited to see him and did not want further visits.

In September, mother told the social worker that Cranshaw would not provide therapy, and the social worker referred her to another therapist, with whom she soon began individual sessions. Mother told the social worker that the recent visit with J.S. had been "great." She did not know why J.S. said he did not enjoy it and felt he should not be "running the show." The social worker replied that if J.S. did not feel safe, she would not make him visit. Mother said that in the future Gabe would park a block away. The social worker said that at an upcoming child-and-family-team meeting on September 25, the team would discuss arranging "a bimonthly visit."[2] Mother joined the September 25 conference call meeting but upon learning that the agency would recommend terminating services, she left the call.

---

[2] While the report says "bimonthly visit," the social worker may have meant semimonthly (i.e., two visits per month).

The September 30 report stated, in conclusion, that mother "has not fully engaged in any supportive services such as therapy . . . to examine how her behaviors have impacted" her relationship with J.S., and that she does not validate his experience or take his needs seriously, show an understanding of how her words affect him, or engage with his mental health team. J.S. did not feel secure with her or want to visit or talk significantly. He wished to stay in his placement, where his foster mother expressed commitment to him. The report recommended ending reunification services and setting a permanent plan of guardianship, while noting that a section 366.26 hearing would be premature, as J.S. and his caregivers were still building a relationship.

On October 28, the court continued its existing orders and set a contested 12-month-review hearing on February 9, 2021.[3]

On January 27, 2021, the agency filed an addendum report. On October 20, it said, mother expressed concern over a phone call about a prescription for J.S.; when a social worker investigated, he learned that J.S. had recently broken his foot playing with a pickax. J.S. told the social worker he did not want to visit with mother. On October 27, mother said she felt excluded from his life. A social worker told her that she is welcome at mental health meetings for J.S. and urged her to attend the next meeting on

---

[3] The unreported October 28 hearing resulted in only a minute order; it appears that when mother opposed the agency's recommendation, the court simply continued the matter to a contested-hearing calendar. Given the importance of settling children's placements and the statutory mandate for semiannual review hearings (§ 366), the 13-week delay of a hearing required by law to occur 12 months after the child entered foster care (§ 366.21, subd. (f)(1)) is troubling. As a result, when the hearing finally occurred, only 10 weeks remained in the 18-month period that is the outer limit, in most cases, of reunification services. (§ 366.21, subd. (g)(1); § 361.5, subds. (a)(3)–(4).)

November 18. The social worker's supervisor said that a worker would soon visit J.S. to "ask if he is ready to have visits." One did so, and on November 23, J.S. said that he did not want to call or visit.

On December 1, mother said that J.S.'s therapy was not working, as he was moving further from her, and that his mental health requires treatment by a doctor, not a therapist. She again complained of his placement, adding that she had hoped he "would've been taken to juvenile hall to learn his lesson instead of being placed in foster care." On December 10, she asked if the agency could condition his ability to stay in his placement on his agreeing to visit; the supervisor said that "the agency cannot force [J.S.] to visit with her, but [the social worker] works monthly with him to support him in visiting." The supervisor urged mother to attend a mental health team meeting for J.S. that day. She said she would do so, but did not.

On December 22, mother complained that she could not reach J.S. The social worker called his foster mother, who said that J.S. had access to a house phone outside his door. On December 10 and January 25, J.S. also said that he did not want to visit mother.

In December, the agency prepared an individualized education plan (IEP) letter to submit to J.S.'s school. The report said that to avoid delaying an IEP assessment, the agency would ask the court to designate J.S.'s foster mother to make educational decisions in place of mother, who would not attend team meetings.

On February 9, 2021, the court held a 12-month review hearing—two and a half months before the 18-month-review deadline. Mother asked that the court continue reunification services to the 18-month limit and issue "a more specific visitation order" so that visits would occur. J.S. supported the termination of services. The court admitted into evidence the above-described reports. Only mother testified.

8

Mother opined that J.S. needs medication from a psychiatrist, not talk therapy; described his use of medication for depression and ADHD; and said she had been "in therapy with [J.S.]" since he was five years old.[4] She had attended two meetings of his mental health team. On the day in April they called her for a meeting, she did not get the calls. Asked what was discussed in the last meeting she attended, she said, "I can't remember. They wanted me to say something and I told them that I was grieving still the loss of my child and I just didn't really feel into giving them a whole lot of information." She claimed that, when she recently told J.S. that she would always love him and asked him to call, he had said, "I can't."

Mother had participated in weekly individual therapy since September to discuss her feelings about the separation from J.S. She could not identify any skills she had learned to cope with the situation.

Asked how visitation has been, she described her unannounced visit to the foster home, claiming not to have known it was improper. When asked about other efforts to visit, she said that she had "tried to call" but could not get through, so she sent J.S. two letters. She said that "they [presumably the foster family] didn't want me to talk to him." Asked how visitation might affect their relationship, mother gave a nonresponsive answer that J.S. is taking out on her his anger over his adoption, and that she could give him a car and private-school education if he will follow her house rules.

Mother testified that she is open to supervised visits but, given her age, wants to visit "where it won't be so far that I have to drive." She opined that she and J.S. could make progress in joint therapy with a single therapist, but the agency had never arranged such therapy.

---

[4] It seems likely in context that mother meant that she had participated in J.S.'s psychiatric treatment, not in joint "talk therapy" with him.

Mother also opposed an IEP. She believed that J.S. is very intelligent and not "two years behind," which she believed essential for an IEP, and added that she can arrange any tutoring he needs. She said that an IEP would stigmatize J.S., as a Black student in a mostly White district.

On cross-examination by J.S.'s counsel, mother admitted having filed a lawsuit on his behalf based on side effects of a psychiatric drug, and she acknowledged that the experience might make him fear medication and prefer talk therapy. She admitted not having thought about the effect on J.S. of having Gabe take her to the foster home or the visit in the park. She denied having refused family therapy in April, saying she tried to arrange joint therapy with Ms. Cranshaw. When asked whether, after Cranshaw declined to work with her, she ever told the social worker that she was open to joint therapy, her answer was nonresponsive.

When asked if she was requesting that the court return J.S. to her custody, mother said, "I'm asking for a closer placement. [J.S.] . . . has to decide if he wants to come home. I love him, but . . . I'm not going to . . . force him to do something that he's uncomfortable with." She added that she "just want[ed] him to be closer to home [so that] if he wakes up one morning and says, 'Oh, I might like to see mom,' . . . he can come."

Mother's counsel argued that the agency's failure to ensure visitation had left her unable to make progress in healing the relationship, and that it was wrong to focus on her delay in starting individual therapy since her case plan did not require it. She cited cases holding that an agency must ensure visitation unless it will be dangerous for the child and argued that the record did not show the agency doing anything to encourage visits beyond asking J.S. if he wanted to visit. She also opposed any limitation of her educational rights, given her experience in the field and thoughtful concerns about an IEP.

J.S.'s attorney argued that J.S. "no longer wants to be obligated to visit with [mother] and feels incredibly strongly about not returning to her care." He distinguished cases about an agency's duty to ensure visitation as involving much younger children. He noted that this was not the first time mother had relinquished responsibility for J.S., which left him unsure of her commitment. J.S. also supported the request to reassign his educational rights, as mother's failure to work with his mental health team had left her out of touch with his current needs.

The court began its ruling by noting the past CPS involvement in J.S.'s life; mother's prior relinquishment; and his anger, suicidal thoughts, and feelings of not being loved or supported. In that context, it held, the agency acted properly in handling visitation with caution.

After noting that mother at first flatly refused services and did not reach out to J.S., but expected him to contact her, the court summarized its views: "Mother has never made efforts to try to bridge the gap here. Mother, as far as I can tell, has not tried ever to go to [J.S.]'s level, to try to see life through [his] eyes. I think she chalks up his behavior to X, Y, and Z and she doesn't have to do anything, it's not her fault that he's behaving this way, and she's never tried to understand from his perspective. [¶] And I think that's exactly what happened with these visits because the [a]gency made multiple offers to try to provide services so that these visits can happen. The Agency did try to encourage [J.S.] and did try multiple times to explain to mom that for these visits to happen, you're going to have to be introspective here a little bit, you're going to have to try to understand things from [his] perspective, and mother just flatly refused." The court concluded that "this is not a case involving a denial of visits. There were conditions placed on them appropriately to safeguard the emotional well-being of [J.S.] and mother refused. So she rejected [services]."

11

The court found mother's testimony "unconvincing" and found "telling" her description of a mental health team meeting in which "she just didn't want to talk," which reflected a pattern of her "flatly refusing to help . . . and to try to think of ways to connect again with [J.S.]." The court found that having Gabe take her to the September visit after having been warned following his appearance at the foster home in August showed "a very fundamental lack of understanding of [J.S.]'s needs."

Finding J.S. able to articulate his desires and uninterested in reunification, the court held that it could not find a reasonable prospect of a return by the 18-month deadline. It found that the agency had offered reasonable services; mother's progress had been minimal; and services should end. The court found a compelling reason to defer setting a section 366.26 hearing, as J.S. was not an adoption candidate and no one was ready to assume guardianship, but it stated that the permanent plan would be a guardianship. It ordered continued visitation. The court also ordered mother's educational decisionmaking rights limited in favor of J.S.'s foster caregivers because it was unreasonable not to conduct an assessment to determine if J.S. was eligible for services.

Mother filed a timely notice of appeal.

## Discussion

1. *The court did not err in terminating reunification services.*

At the outset of a dependency proceeding, the emphasis is on preserving the family, given parents' "strong fundamental interest . . . in the care, custody, management and companionship of their children." (*D.T. v. Superior Court* (2015) 241 Cal.App.4th 1017, 1034.) But children " 'have compelling rights to be protected from abuse and neglect and to have a placement that is stable [and] permanent.' " (*Ibid.*) To balance these "sometimes competing interests," dependency law "shift[s] the emphasis" from family preservation to promoting

12

the child's best interests "if efforts at reunification produce unsatisfactory results or drag on too long." (*Ibid*.) Section 361.5 thus sets "a series of time limitations" on reunification services, "with a 12-month presumptive period for children age three or older, and an 18-month maximum." (*Id*. at pp. 1034–1035.)

If a child of J.S.'s age is removed from parental custody, the court must order reunification services for a period "beginning with the dispositional hearing and ending 12 months after the date the child entered foster care as provided in section 361.49" (§ 361.5, subd. (a)(1)(A))—which in this case was November 20, 2019. At a 12-month review or "permanency" hearing, the juvenile court must order a child returned to parental custody unless doing so will create a "substantial risk of detriment" to the child's "safety, protection, or physical or emotional well-being." (§ 366.21) The court must also determine if reasonable services designed to help the parent overcome the problems that led to the removal "have been provided or offered." (*Id*., subd. (f)(1)(A).)

If at a permanency hearing the parent has received the requisite period of services and the court cannot order the child returned to his or her custody, it has three options: (1) extend reunification services until an 18-month review hearing (§ 366.21, subd. (g)(1)); (2) schedule a hearing pursuant to section 366.26 to terminate paternal rights and set a permanent placement (§ 366.21, subd. (g)(4)); or (3) order that the child remain in foster care (*id*., subd. (g)(5)).

To continue reunification services to the 18-month mark, the option mother advocated, the court must either find that the agency has not provided reasonable services or find "a substantial probability that the child will be returned to the physical custody of his or her parent . . . and safely maintained in the home within the extended period." (§ 366.21, subd. (g)(1).) To find a substantial probability of return, the court must make three subsidiary

findings, namely, that the parent has (A) "consistently and regularly contacted and visited with the child," (B) "made significant progress in resolving the problems that led to the child's removal" and (C) shown the ability to complete their treatment plan and "provide for the child's safety, protection, physical and emotional well-being, and special needs." (*Id.*, subd. (g)(1)(A)–(C).) Mother challenges both the court's finding that the agency offered reasonable services and its holding that it could not find a substantial probability of return.

> a. *The evidence did not compel the juvenile court to find a substantial probability of return by the 18-month deadline.*

Mother does not challenge any finding made by the court but disputes its holding that it could not make the three findings required to extend reunification services past 12 months. (§ 366.21, subd. (g)(1).) While an agency bears the burden at a 12-month hearing of proving that returning a child to a parent will "create a substantial risk of detriment" (*id.*, subd. (f)(1)), if the agency bears that burden—as the agency undisputedly did here—the burden shifts to the parent seeking further services to show a substantial probability of return by the 18-month deadline. (*Id.*, subd. (g)(1).)

Because mother challenges the resolution of issues on which she bore the burden of proof, the question on appeal "becomes whether [her] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 4.) "Put another way, the issue is 'whether the evidence compels a finding in favor of [mother] as a matter of law.' " (*Valero v. Board of Retirement of Tulare County Employees' Assn.* (2012) 205 Cal.App.4th 960, 966.) It is " 'almost impossible' " for a party who had the burden of proof below to satisfy that standard on appeal. (*Atkins v. City of Los Angeles* (2017)

8 Cal.App.5th 696, 734.) In this case, the parties debate all three findings required to justify extending services past the 12-month mark, but because mother must prevail on all three to succeed on appeal, we need discuss only one to establish that she falls short.

We think it clear that the evidence does not compel a finding that mother proved an ability to complete her treatment plan and provide for J.S.'s safety, physical and emotional welfare, and special needs in the short period that remained before the expiration of 18 months. (§ 366.21, subd. (g)(1)(C).) The plan called for the two to engage in joint therapy to rebuild trust, and for mother to repair her relationship with J.S. by offering to listen and taking time before responding when he is upset. But for the first seven months of the 12-month period, mother did not take significant steps to seek contact with J.S., besides a few phone calls and the unsuccessful supervised visit in March, at which she showed an ongoing inability to listen and respond effectively to his feelings. Moreover, mother repeatedly refused to engage in joint therapy, or even in the individual therapy the agency asked her to pursue to prepare for joint therapy.

Mother did say in late June 2020 that she was open to family therapy focused on J.S. and that she understood that the agency wanted her to have individual therapy first, yet she only started such therapy in September, over nine months into the 12-month period. When asked if she had learned skills in therapy to cope with J.S.'s departure, she said that she had not. She now complains that the agency never set up family therapy, but she repeatedly declined invitations to participate in meetings of J.S.'s mental health team or to work with a parent partner from that team. She contends that she tried to arrange joint therapy with Ms. Cranshaw, but she does not claim that after Cranshaw declined to provide therapy, or after mother began individual therapy with another provider in September, she ever told the agency that

she wanted or was prepared to engage in joint therapy with J.S., or requested a referral.

Nor does the record compel a finding that mother showed the ability to provide for J.S.'s emotional welfare. (§ 366.21, subd. (g)(1)(C).) She needed to learn to take his emotional needs seriously, consider his perspective, and listen supportively, but there is little evidence that she accepted or worked to satisfy that need. She admitted not having thought about the effect on J.S. of having Gabe present at their encounters. When cross-examined about the effect on J.S. of statements like her remark that he should have been sent to juvenile hall, her testimony showed an ongoing inability or unwillingness to consider how her words affect J.S. or impair their relationship. Having observed her testimony and demeanor, the court found that she "has not tried ever to go to [J.S.]'s level, to try to see life through [his] eyes," but "chalks up his behavior to X, Y, and Z . . . and [has] never tried to understand from his perspective." Mother does not cite uncontradicted evidence compelling a contrary finding.

The record also does not compel a finding that she can provide for J.S.'s special needs. Mother notes that at the hearing she acknowledged his mental health problems and admitted—albeit on cross-examination—that he might benefit more from talk therapy than medication, given his experience of side effects. She also cites a meeting in October 2019 at which a summary indicates she stated that J.S. can benefit "from support services such as working with a therapist, a psychiatrist, and medication to help with [his] emotional well-being." However, given her repeated refusals to work with J.S.'s mental health team; her comment to a social worker that he needs treatment by a doctor, not a therapist; her testimony that "he needs to be on the constant medication and under the doctor's care. Not in therapy, but . . . a psychiatrist"; and her refusal even to permit a determination of whether he is

16

eligible for an IEP, the evidence she cites is far from " 'uncontradicted and unimpeached.' " (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528) It certainly does not compel a finding that she is sufficiently flexible and open to expert advice to satisfy J.S.'s special needs.

    b. *Substantial evidence supports the finding of reasonable services.*

"When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence. [Citation.] ' "In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact." ' " (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971 (*Alvin R.*).)[5]

Mother contends that while she admittedly refused individual therapy or supervised visits for the first seven to nine months after the disposition hearing, "on August 21, 2020, almost six full months before the hearing in question, [she] called the agency to arrange visitation with [J.S.] as soon as possible" and agreed to work with Mr. Lubembe. She contends that her

---

[5] Citing section 366.21, subdivision (g), mother contends that the court was required to find reasonable services by clear and convincing evidence. But a court must make such a finding by clear and convincing evidence only as a prerequisite for setting a section 366.26 hearing (§ 366.21, subds. (g)(1)(C)(ii) & (g)(4)), not as a prerequisite for ordering that a child remain in foster care (*id.*, subd. (g)(5)), as the court did in this case. However, the agency does not dispute the evidentiary standard, and we conclude that the court's order must be affirmed regardless of whether it was required to find reasonable services by clear and convincing evidence or by a preponderance of the evidence. (Cf. *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1239 [on appeal from finding of reasonable services in case involving section 366.26 hearing, " '[w]e review the record in the light most favorable to the trial court's order to determine whether there is substantial evidence from which a reasonable trier of fact could make the necessary findings *based on the clear and convincing evidence standard*' "].)

belated agreement to engage in supervised visits left the agency "nearly six months" to ensure the visitation it was required to provide, and that its acquiescence in J.S.'s refusal to visit bars a finding of reasonable services.

Initially, mother is mistaken about the duration of the period in which the agency failed to induce J.S. to visit. After she requested a supervised visit on August 21, the agency and Lubembe arranged one in Pleasanton on September 12. That unsuccessful visit came nearly 10 months into the 12-month period of mandatory services, which ended on November 19. While the permanency hearing was delayed until February, the pertinent question is whether the agency's failure to induce J.S. to engage in further visits between September 12 and November 19 precludes a finding that it provided the requisite 12 months of reasonable services.

The agency repeatedly urged mother to accept supervised visits and referrals for individual and joint therapy, but she refused to engage in therapy until the end of June, did not begin individual therapy until September, and did not agree to supervised visits until August 20, nine months into the 12-month period. The agency repeatedly invited her to meetings of J.S.'s mental health team, and offered the help of a parent partner, but she attended only two meetings, one after the 12-month period, and refused to work with a parent partner. Given the strength and consistency of J.S.'s unwillingness to visit, his age, and the damage done by mother's earlier failure to pursue contact and by Gabe's presence when the two did meet, the court did not err in finding that the agency offered reasonable services tempered by appropriate caution about visitation. The record contains neither expert testimony nor any other evidence suggesting that, under the circumstances, there were more strenuous measures the agency reasonably could or should have taken to overcome J.S.'s resistance to meeting with his mother.

18

Mother cites *Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, in which the Fifth District issued a writ directing a juvenile court to vacate a finding of reasonable services, but the case is distinguishable. A 13-year-old minor, C.C., alleged that her mother repeatedly beat her. (*Id.* at pp. 663–664.) At the start of the case, C.C.'s attorney told the court that C.C. did not want to visit because of the abuse and the minor's resultant fear of her mother. The court found at the outset that visitation would be detrimental and directed that none occur until further order. (*Id.* at pp. 664–665.) Through lengthy proceedings ending in an 18-month-review hearing, the court never modified its detriment finding or authorized contact beyond letter and gift exchanges, despite the agency's desire to arrange therapeutic visitation, and despite evidence that C.C. had initiated positive, unauthorized phone and text contacts with her mother and had vacillated about whether she wanted to visit. (*Id.* at pp. 665–670.) The appellate court held that the denial of all in-person contact at some point became unreasonable, requiring a further period of services. (*Id.* at pp. 677–678.)

Here, the court never forbade contact, and the agency encouraged visits, offered numerous therapeutic services, and arranged two supervised visits. *Serena M.* does not suggest that its inability to ensure further visits in the 10-week period after the September visit bars a finding of reasonable services.

2. *The court did not abuse its discretion regarding educational rights.*

A juvenile court may limit a parent's right to make educational decisions for a child under its jurisdiction, and appoint a responsible adult to do so, to the extent necessary to protect the child. (§ 361, subd. (a); Cal. Rules of Court, rule 5.649.) We review such orders for abuse of discretion. (*In re D.C.* (2015) 243 Cal.App.4th 41, 58.) Here, the court did not abuse its discretion by finding that mother's refusal to permit J.S. to be evaluated for an IEP was an unreasonable overreaction to her concern about stigma. Because her failure to

work with J.S.'s mental health team and lack of contact left her out of touch with J.S.'s current needs, it was reasonable to conclude that it would serve his interests to have the caretakers with whom he was living make future educational decisions.

## Disposition

The challenged orders are affirmed.

POLLAK, P. J.

WE CONCUR:

STREETER, J.
ROSS, J.*

---

* Judge of the Superior Court of California, County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.