Filed 11/29/22  In re X.F. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re X.F., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br>v.<br>N.T.,<br><br>    Defendant and Appellant. | A163836<br><br>(Alameda County Super. Ct. No. JD03203602) |

N.T. (mother) appeals from the juvenile court's order removing X.F. (minor) from her custody following adjudication and disposition orders under Welfare and Institutions Code section 387.[1]  Mother advances two claims on appeal: (1) that the case had reached the post-permanency stage of the proceedings and the court erred in not considering whether she was entitled to additional reunification services under section 366.3, and (2) even if the case had not reached the post-permanency stage, she was not provided "reasonable services" under section 361.5.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

We affirm.

**BACKGROUND**

*Section 300 Petition*

In January 2020, mother informed law enforcement she was unable to provide care for the then 13-year-old minor or meet his mental health needs and was "unable to keep [minor] and his siblings safe in the home."[2] The Alameda County Social Services Agency (Agency) filed a section 300 petition, alleging no provision for support (§ 300, subd. (g)).[3]

In its detention report, the Agency stated minor remained at an assessment center awaiting placement, while the family team determined whether he needed "a higher level of care through a Short Term Residential [therapeutic program]." Mother reported minor has "had mental health needs since he was approximately four years old" and she has been "taking him to therapy, family counseling and family therapy throughout the years." She has "attempted to identify his needs through numerous assessments, evaluations, and resources, but has remained unsuccessful at addressing his behaviors." Mother called the Hayward Police Department because he had run away and she felt "unable to keep her other children in the same home safe due to [minor's] ongoing behavioral and mental health concerns, including sexualized behaviors, threatening to harm himself and/or family members, and risk-taking behaviors."

---

[2] Mother has five children, including X.F. Two are adults, and two others are minors, none of whom are parties to this appeal.

[3] The petition was later amended to add a second subdivision (g) allegation as to father whose whereabouts were unknown. Father was deported following a conviction for sexual abuse of minor's sibling, and he is not a party to this appeal.

2

Mother also reported she had received a call from minor's school reporting minor had "engaged in anal sex" with another minor, who "may be developmentally delayed." Mother was unsure if the accusations were true, "if the act was consensual, or if [minor] manipulated the girl into 'saying those things' because he wanted to leave" the family home. When mother confronted minor about the allegations, the two " 'got into it,' " and minor "jumped out of the moving car, and ran away."

The Agency recommended the court find a prima facie showing had been made that minor is a child described in section 300, find continuance in the home was contrary to minor's welfare, find that initial removal was necessary and order family reunification services. The court agreed, made the recommended findings and services order, and set the matter for a jurisdictional and dispositional hearing.

In its jurisdiction/disposition report, the Agency detailed more of minor's mental health history, noting he had two previous mental health hospitalizations in the past six months after he expressed "suicidal ideation." Mother did not think these hospitalizations helped because hospital staff told the parents, in front of minor, "parents like them are the reason he wants to commit suicide," and at the group home where minor was placed after the second hospitalization, he "had engaged in oral sex" with another minor and had been "non-compliant and disruptive." Mother reported minor had run away from home on "four instances," necessitating her calling the police. She claimed minor had "no regard for others and will do what he wants."

Mother, herself, was "currently in intensive mental health treatment to address her own needs," and she felt she was "doing the work to get better, [and minor] needs to do the same." She "reported that she . . . gets

3

overwhelmed with all that is going on and can lash out by yelling," and she "admitted getting physical with [minor] in the past."

Minor did not "want to see or talk to his mother," and did not want to return home "because he imagines the worst will happen if he returns there."

The social worker opined that the "family does not appear to fully understand or agree that many of these behaviors are likely due to mental health issues, but instead feel that [minor's] actions are fully based on his choice." In the Agency's view, it was "very important" minor receive a medication reassessment, medication management, a mental health assessment, therapy, and possibly a psychiatric evaluation. Additionally, once minor was "in a better place to engage with his family, it will be crucial to have family therapy that includes at least [minor] and his mother."

The Agency recommended the court find the Welfare and Institutions Code section 300, subdivision (g) allegation true, find minor remain out of his home, adjudge minor a dependent child of the court, and order reunification services for mother. The court agreed, issued appropriate orders, and set the matter for a review hearing.

In its six-month status review report, the Agency stated there had been no visitation because minor was "refusing to have any contact" with mother or any other family members. Minor's "unwillingness to have contact with his mother makes it challenging for [her] to practice parenting skills." The social worker and "other services providers continue to encourage a relationship" between mother and minor. The Agency noted once minor "is in a better place to engage with his family, it will be crucial to have family therapy that includes at least [minor] and his mother." Minor would be starting a new school in July where he would receive academic and therapeutic (group and individual) services. He also was meeting weekly

4

with an intensive services foster care support worker who provided him with "emotional support in the placement and the community," engaging with a therapist bi-weekly, and engaging with a psychiatrist monthly to monitor his medication compliance.

In the meantime, the family's team consisting of minor's support worker, foster parent, parents, therapist, met to discuss "casework priorities given [minor's] pattern of refusal to communicate with his mother" and the social worker was "facilitat[ing] collateral contact between [mother] and [minor's] service providers." Mother and minor would "continue individual therapy, working towards family therapy."

Mother remained "committed to improving her mental health needs by being open to mental services." She admitted it "has been challenging trying to manage her household, maintaining relationships with her other children and partner, and completing tasks in relation to her case plan." Mother's therapist had recently retired and mother stated she would "reach out" to another community center "to resume therapeutic services." Mother reported "she became . . . frustrated with [minor]" because her disciplinary actions, which included "elevated voices, combative tone of voices and sometimes physical discipline," were "not effective and [minor's] unmanageable behavior continued to increase until a more severe mental episode happened."

The Agency recommended minor remain a dependent, remain in his out-of-home placement, and that the court order continued reunification services for mother.

At the status review hearing, mother's counsel submitted on the recommendation observing mother was "pretty devastated about the lack of contact between her and her son," but she was hoping family therapy would start soon through minor's new school.

5

The court told the Agency, "I think it's pretty clear . . . family therapy is critical to any chances of reunification here. [¶] . . . I know the Agency wants to be sensitive to [minor's] wishes, and it's important the Agency is that way. He's 14 years old, and we don't want to railroad his feelings about anything so important. But I do want the Agency to try its best to facilitate family therapy to initiate it as soon as possible. . . . It's important that that particular barrier be addressed and try to be broken down somehow so that the family can have a chance at reunification within the time permitted by law." With that, the court found mother had made partial compliance with her case plan, found by a preponderance of the evidence that returning minor to mother's care would create a substantial risk of detriment, continued minor as a dependent, and continued services for mother.

In its 12-month status review report, the Agency reported family therapy had started the month after the last hearing. However, there were only four in-person sessions before minor's school switched to being virtual and therapy was stopped.

Mother had spoken to minor's therapist who stated he "would push the mental health team to get more family therapy in place." Mother called minor once a week to talk to him and was in "active communication with his therapist." Minor's therapist reported mother was "proactive in contacting her for collateral sessions for [minor]" and mother had " 'insight into her own trauma and process as well as how it affects [minor].' " "Throughout this reporting period, [mother] maintained her psychiatric appointments and medication routine."

Minor had an unsupervised in-person visit with mother on Thanksgiving, and "[n]o concerns were reported." Minor declined to visit on Christmas but did agree to weekly visits starting in the new year. Both

6

mother and minor were continuing with individual therapy and were medication compliant.

The Agency recommended that minor remain in his out-of-home placement and a dependent of the court, and that mother receive additional services. Mother was in agreement with this recommendation.

By the time of its interim review report, minor had been in foster care for 14 months. Weekly visits had continued in the new year, and minor had recently begun a two-week extended visit with mother, and mother reported "everything is going well," and she had not had "any concerns since the visits started." During a home visit, minor reported that "things are going well," "his communication with his mother is a lot better than before," he was "happy to be home with his family," and he had "no concerns to report." Although the Agency "worried" minor had only recently "committed to weekly visit[s]," mother remained "committed to him and doing whatever it takes to have him back." The Agency recommended minor remain a dependent of the court but be returned to his mother's care with family maintenance services, with the "hope . . . that in the next six-months, with family therapy restarting they can heal their relationship."

At the review hearing, mother submitted on the report. The court found reasonable services had been provided, and mother had made substantial progress in alleviating the causes necessitating placement. It continued minor as a dependent, ordered minor placed with mother, and ordered family maintenance services for minor and mother.

***Section 387 Petition***

A month later, in May 2021, a social welfare worker met with mother who reported minor had left home for 10 days because she had taken away his cell phone because he "was not following house rules and had his cell

7

phone locked." After confiscating minor's phone, mother became concerned about minor "texting and sharing pornographic pictures with some unknown 22-year-old male online, that was grooming the minor." Additionally, minor had not been taking his psychotropic medication, was not going to school, and had "told his psychiatrist of physical threats against the parents," and mother did not feel safe.

Two weeks later, the Agency held a "removal consideration" meeting with mother and "decided that the best course of action to keep minor safe was for the mother to sign a Voluntary Relinquishment form." Mother signed the form, and minor was taken to an assessment center.

After mother reported she was no longer willing to care for minor, the Agency filed a section 387 petition. Minor was "delivered into protective custody" and approved for a short-term residential therapeutic program.

In its detention report, the Agency noted the family had received one year of reunification services and mother was "unable or unwilling to provide adequate care and supervision for the minor due to his behaviors and their trauma history." The Agency recommended the court find a prima facie showing had been made that minor is a child described in section 300, find continuance in the home is contrary to his welfare, and find removal was necessary.

At the detention hearing, the court heard from mother's counsel and mother. Counsel stated mother and family "have worked very hard, and this is a real struggle for them. But the minor simply isn't safe. So, we are very glad . . . that [the social worker] has been assigned to try to convince him to get more services and therapeutic intervention. [Mother] did not have a lot of success convincing him to do those things, and it is very heartbreaking for her."

Mother stated, "I just hope that the Agency, this time, will step in and get my son the help that he needs. He does need to be in a residential setting, because of his mental health. [¶] There are possibly some more underlying issues with him that haven't been discovered, but he hasn't been able to be in placement long enough to get any consistent services: Everybody on his support team is in agreement with this, from Kaiser to his psychologist. . . . [¶] There's also other exasperating issues that [minor] has been involved with, including sexual exploitation, that needs to be addressed. [¶] He is not safe. He's not safe around electronics. He's not safe with money. And, again, I just hope that this time . . . the Agency can get my son [the] help that they promised that they would get for him the first time around."

The court followed the Agency's recommendations and set the matter for a contested jurisdictional and dispositional hearing.

Shortly thereafter the minor ran away from his foster placement, and the court issued a protective custody order. At the time the Agency prepared its jurisdiction/disposition report, minor remained out of custody.

The Agency was "worried" minor had "not received an updated evaluation for medication," and was "not having his behavioral, mental, and emotional needs met in a healthy manner while" he was not in a placement. Additionally, the Agency "worried . . . minor is being sexually exploited" and "is being groomed to be a recruiter," and that he had been playing "video games and online chatting to engage with older men." The Agency submitted a referral to MISSEY (Motivating, Inspiring, Supporting and Servicing Sexually Exploited Youth) for CSEC (Commercially Sexually Exploited Children) services for minor and requested a referral for a psychological assessment.

Mother explained she had "tried to support her son and wanted to engage him in therapy but he was unwilling," that he "sabotages the attempts to engage him in the family," and that his "behaviors began to jeopardize the safety of her family and that is what lead [*sic*] her to be unable and unwilling to care for him." Mother wanted to see minor "get some help before she can see him coming home. [Minor] has not participated in treatment in the past and it is a worry going forward that he will not engage in services."

The Agency stated minor needed to "return from AWOL and be placed" in a short term residential therapeutic program, needed a psychological evaluation to ensure his medical needs are being met, and needed to engage in the sexually exploited youth services. Mother, in turn, needed therapeutic support with her son. The Agency recommended minor remain in an out-of-home placement and that family reunification services be offered to mother.

At the June 2021 hearing, the court set aside the prior order placing minor with mother and continued minor as a dependent of the court. The court also ordered reunification services for mother but noted "[r]eunification services are time limited. Because minor was three or older on the date of removal, services will not extend beyond twelve months from the date the minor entered foster care unless the Court finds at that time that there is substantial probability that the minor will be returned within a total of 18 months from the date of removal."

The court then stated the likely next hearing would be in December, and the following colloquy occurred:

"[Agency counsel]: . . . [I]f the Court looks back to the original removal in this case, 18 months from that date is actually July 15 of this year.

10

"The Court: Right. We're granting a new six-month period of services based on the 387 today. [¶] . . . [¶] Well, I think the family should be entitled to the full six months here. I understand your point. The only guarantee of six months is from original disposition. [¶] What are you asking the court to do?

"[Agency counsel]: I'm . . . submitting the issue to the Court. I wanted to make sure it was raised on the record though because the report didn't address this question directly and so it should be clear to all counsel and parties that if the Court does order these six months of reunification services, the next review hearing will be considered not a six-month hearing, but a much later stage, an 18-month review hearing.

"The Court: Right. So the 18-month date is on what date?

"[Agency counsel]: July 15th of this year, Your Honor. Two weeks from now.

"The Court: You're asking the Court to set the review hearing before then?

"[Agency Counsel]: I'm submitting the issue to the Court, Your Honor. [¶] So if the court sets a six-month hearing six months from today's date, I'm making a record that that date will still be considered an 18-month hearing under the law, not a six-month review hearing. [¶] . . . [¶] . . . The Agency did find this a very difficult case in which to make [a] recommendation because the timeline technically expires in two weeks, but we are asking the Court to go ahead and order those reunification services.

"The Court: . . . [¶] My hope is the family receives adequate provision of services long enough to be successfully reunified, but I'll bring this back before the 18-month date with an understanding that the Court will be interested in a recommendation that would extend services beyond the 18-

11

month date depending on the circumstances.  [¶] Does anyone else wish to address this?

"[Agency counsel]:  Your Honor, that being the case, since this is only two weeks away and a status review report would be due ten days before the hearing, it's not really feasible.  And I apologize on behalf of the Agency that this is a challenging thing to navigate within the Agency's systems.  We really will not be able to have it assigned to a reunification worker and a report written by two weeks from now.  The report would likely just be relying upon today's report, which has all of the information contained in it that we'd be prepared to submit to the Court. . . .

"The Court:  We would need different findings from the Court to extend services.  Are there exceptional circumstances?  Is there good cause to continue?  Those types of recommended findings and orders.  [¶] So if you want to bring this back in two weeks and have the Agency resubmit recommended findings and orders to fit the circumstances of the case, we can do that as well.

"[Agency counsel]:  I'll submit to that suggestion, Your Honor.  The Agency will present whatever it can within those two weeks then.

"The Court:  All right. . . .  We'll bring this back before the 18-month date."  There were no other objections or comments.

In its July 2021 addendum report, the Agency recommended finding the section 387 petition true, continuing the minor in an out-of-home placement, and bypassing mother for reunification services.

The Agency reported that mother stated "for the first nine months of her case . . . [the Agency] did nothing for her and her family."  She maintained "they have not received family therapy and her son has not received the mental health services that he needs."  Mother was "very

12

emotional throughout the call" and stated, she "does not think she can care for her son at this time but wants him home eventually."

The Agency explained mother had received services for 18 months. She had first relinquished minor in January 2020 and received reunification services for 15 months before minor "was returned with . . . [m]aintenance [s]ervices. He was only home for two months before [mother] signed a Voluntary Release of Child Custody form and placed [minor] back in the care of the Agency." Mother had "not been able to demonstrate that [minor] can safely stay in her home. [Minor] has had mental health services throughout his life but still has not made the progress needed to be in his mother's care, as evidence by [mother] relinquishing custody in June 2021. It does not seem possible that these circumstances would change within the next six months, despite [mother's] wishes."

At the July hearing, the court stated, "it was brought to the Court's attention that the minute order from our last hearing was not necessarily incorrect. . . . [¶] I think the confusion here, it stems from the Court being unclear about what exactly it was doing on last court date, but I did make all of the findings and orders and then the discussion about the FR clock expiring came up and there was some back and forth, but in short, the Court continued the matter to today's date and that was for further juris dispo hearing on the 387 petition and the purpose of that was so that we could land on appropriate findings and orders to match the circumstances of the case. [¶] What I did not do, however, is expressly strike or rescind or set aside all the previous findings and orders that I had made. I did not expressly do that. So that's why it was not reflected in the minute order. [¶] So I intend to do that now because our contested proceeding will be for contested juris dispo on the 387. [¶] So the previous findings and orders that were made and, by

13

implication, set aside at the last hearing are now expressly set aside so that we can address them when we come back from the contested hearing, okay. [¶] Is that clear? Anything to raise?"

Counsel for the Agency stated, "so all of the issues, jurisdiction and disposition, remain open. The Court has not—by this order, the Court is now making clear that it has not made final orders on jurisdiction or disposition for the 387 at all." The court replied, "Correct."

Counsel for mother did not make any comments or objections. The court set the contested hearing on the section 387 petition for September.

In its September 2021 addendum report, the Agency once again recommended bypassing reunification services, stating mother had received "18 months of services from January 15, 2020 to July 15, 2021."

The Agency reported it had spoken with mother and minor at different points in July, August, and September.

As of July, minor was at a short term residential therapeutic placement, and he wanted to be placed in a foster home and not a group home. He agreed to individual therapy but refused family therapy. Minor said he "does not want to talk with his mother and said he wants to kick her." When asked why he felt that way, minor responded " 'If you were being hit all the time wouldn't you want to hit the person back?' " Minor confirmed mother was hitting him when the social worker asked. Minor was just beginning with a new therapist and was not allowed to play video games alone in order to "monitor if he is chatting with anyone" online. Minor was scheduled to have therapy twice a week for one hour each session.

Mother thought minor had "serious needs that the Agency has never addressed," and she "was frustrated that he is only now receiving services that are more intensive." She asserted minor had been "sexually exploited"

while in foster care and that she "always wanted him in a group home." The social worker explained the Agency "could not just put children into group home care and there are certain criteria that must be met to be placed in one." Mother also asserted "the Agency has not provided any mental health services for [minor] or the family" and she wanted minor to have "a full psychiatric evaluation."

Mother additionally "raised concerns" about minor's behavior after he had recently returned home. She stated he had been "sending naked photos to older men on the internet," and he had taken photos of his sister's room at the request of one older man. Mother admitted the "relationship with [minor] is strained due to his behaviors."

Five days after the Agency spoke with minor, his therapist reported he had briefly run away from his placement—the police found him hours later—after becoming upset about potentially having to stay in a group home for six months.

As of August, minor was still refusing to participate in family therapy and visits with mother. He did not want to return to mother and was "happy that the recommendation [was] for termination of services." Minor's doctor stated he would be "completing a mental health assessment next week." When asked if he could "offer family therapy for a few sessions to support [minor], while the Agency makes a family therapy referral," minor's therapist "responded that he [would] not." Additionally, the therapist stated minor "would 'blow a gasket'" if mother showed up to minor's upcoming assessment.

The social worker discussed family therapy with mother explaining "it would likely need to start as individual therapy and then progress to include [minor]," as he was "not ready for family therapy." Mother said "she is okay

15

with that, as she wants [minor] to join therapy and she wants to reunify." She called minor weekly but he refused to come to the phone. The Agency referred mother to a therapist. However, that therapist stated she could not do family therapy virtually since X.F. was a minor. Mother then e-mailed the Agency stating the therapist would not provide family therapy and as she had her own therapist, she did not "want to explain her trauma again to a new provider." She stated she did not need an individual therapist, but wanted a family therapist, asserting "it is not fair that she has not had family therapy and the Agency wants to terminate her rights."

By September, minor was doing well in therapy but was "not close to talking about his mother and the relationship between them" and still was refusing visitation. Minor's therapist stated "Elite Family Services can help with visitation but that if [minor] refuses to go, that is his right."

Mother and the Agency continued to discuss mother's "many concerns which included child support, visitation . . . , family therapy, and [minor's] willingness to see her." She was "frustrated that [minor] can choose whether or not he can see her and said he has learned to 'manipulate the system.' " Mother explained that if minor was not told to go to family therapy, he would continue to avoid her. The Agency informed mother minor was doing well in therapy and that "forcing him to go to visits or family therapy at this time could jeopardize his stability," that minor "is not open to talking about [mother] in therapy and that visitation and family therapy is not possible until [he] has processed more of his feelings," and it "could be detrimental to [minor's] progress if he was 'forced or tricked' to engage in family therapy at this time." Mother did not agree with this stating, "months keep going by and that nothing happens." The social worker explained minor was "feeling safe in his placement," was not running away, and was voluntarily engaging

16

in therapeutic services. Mother continued to blame the Agency for minor's placement in protective custody and did "not acknowledge any of her actions as a possible reason [minor] is in foster care."

The Agency stated minor "needs a psychological evaluation to ensure his medical needs are being met," needs to engage in the sexually exploited youth services (for which a referral had been submitted in June) and needs to continue with individual therapy and "discuss his feelings that hinder family therapy with his mother."

At the contested hearing on the section 387 petition, the court heard from counsel.

Minor's counsel stated minor was in agreement with the Agency's recommendations, he saw no point in trying services again, and did "not see further services fixing the relationship at this point." Nor did he want "contact with his mom and says he is not sure when he will want contact, if ever."

Mother's counsel objected to the bypass of services "without evidence." She then said mother wanted to address the court, not "by way of testimony" or "as evidence," but just wanted to state "her position."

Mother asked the court to "see that the County did not make reasonable efforts in providing essential services vital for my family to reunify." She outlined minor's behaviors throughout the dependency and stated the Agency had recommended placement in a residential treatment facility and an in-home therapist. But "[i]nstead of heeding the advice of professionals that had been helping me care for my son since birth, they placed him into an intensive therapeutic foster care home which provided no therapeutic services and left him electronically unsupervised." She claimed from January to September 2020, the family had "no communication,

17

visitation, or family therapy" even though they "continuously asked for it and even suggested doing it by Zoom." After the family received family therapy at the end of September, they "progressed to spontaneous unsupervised visits, overnight visits, and then he was placed back into my care" but "without family therapy or any therapeutic supports in place." And, continued mother, neither his current school nor his current placement "provides family therapy and for one reason or another, family therapy still hasn't started through the County's process. We haven't had any contact or visitation with him since his second removal. [¶] Wouldn't you agree that family therapy is a vital and necessary tool for the reunification process, and by not utilizing this tool, the County has failed its duty to the reunification process."

The following colloquy occurred between counsel and the court:

"[The court]: . . .[Mother's] comments are quite loaded in the sense of raising legal issues, evidentiary facts that are being offered. So, [counsel], I'm confused about what the posture of this case is and, more specifically, what the Court is expected to do by way of response here if this is offered not as evidence."

"[Mother's counsel]: . . .[I]t's my client's position that she was not offered services that were adequate to her needs. That is not a cognizable legal argument at this 387, so we are just making an objection.

"[The court]: Okay. Does any party wish to respond? [¶] . . . I'm just a little bit baffled by the posture of the case by way of attorney conduct and it's no way a reflection on you [mother] or your comments, okay."

"[Agency counsel]: Your Honor, on behalf of the Agency, I would just note that it is a strength that is mentioned frequently throughout the reports that are in evidence that [minor] has family members, chief among them his mother, who are very invested in his well-being. [¶] However, today, because

18

of the legal posture of where we are in the case and the timeline that has elapsed in terms of the amount of services, the length of time, what the legislature has created is a system where at a certain point, and we're past it now, the focus shifts away from reunification and to the long-term stability and permanency of a child. . . . [¶] It doesn't preclude [minor] from having future contact with his family, from engaging in therapy to heal family relationships in the future, or from a future changed circumstances petition being filed. . . . [¶] . . . [¶]

"[Minor's counsel]: . . . I hear [mother's] words and, you know, I understand where she's coming from. I think it's just at this point, family therapy is not really an option because it's not something that [minor] is at all interested in. And I just—while I agree that it would have been great to have had that previously, we are no longer at that position in the legal timeline . . . and I just don't see family therapy at this time being useful because [minor] does not want to participate and I don't think forcing him to participate would help reunification at all. [¶] . . . [¶]

"[Mother]: Can the County just explain when the services were ever provided to aid in the reunification process or referral to services? [¶] . . . [¶]

"[The court]: [Mother's counsel], this is part of what I'm trying to get at here. If these are contested legal issues, now is the time and place for evidence and testimony. This isn't a dialogue here where we're going to unpack that in a different and sideways way.

"[Mother's counsel]: Your Honor, I understand that. There were three reasonable services findings leading up to the 387 that we did not contest ultimately, so it wasn't legally cognizable and I've advised [mother] it's because that is not an available argument."

The court went on to state, "So here we are. Under the law, services have been provided within a time frame that the law allows and that time frame is now exhausted. [¶] Mother signed a voluntary release . . . and the Agency is now not in a position to offer additional services. . . . [Minor] is simply not in a frame of mind where he wants contact with mother. He has not expressed an interest in engaging in family therapy nor engaging in services with an eye toward return to mom and we're just not in a position where provision of services would lead to return any time soon, even if we set aside the issue of the fact that the family has received 18 months of services—or rather, about 15 months, if the calculation is correct, but as we know, the clock continues to tick when there's a 387, so to speak."

The court found the allegations in the supplemental petition were true, continued minor as a dependent of the court, and found by clear and convincing evidence minor must be removed from mother's custody, and that reunification services should be denied. It further found a 366.26 hearing was not in minor's best interest because he "is not a proper subject for adoption and there is no one able or willing to become a legal guardian at this time." The court ordered minor remain in his short-term residential therapeutic program "and a permanent plan of legal guardianship is appropriate and is ordered as the permanent plan." Finally, the court stated the Agency is "not ordered to provide reunification services as they've already been provided for 18 months." The court then set a review hearing under section 366.3.

DISCUSSION

*Additional Reunification Services Under Section 366.3*

Mother does not challenge the findings the juvenile court made under section 387.[4] Rather, she contends the juvenile court abused its discretion in denying additional reunification services based on a "misconception" of the law, namely that it failed to consider additional services under section 366.3.[5]

"Services are offered to children and families throughout juvenile dependency proceedings, but these services are treated differently by statute at different stages. If the juvenile court finds that reasonable services have not been provided during the earliest stages, the first 12 months of the

---

[4] "When an agency seeks to change the placement of a dependent child from a parent's care to a more restrictive placement, . . . it must file a section 387 petition. (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161. . . .) The petition must allege facts that establish by a preponderance of the evidence that a previous disposition order was ineffective, but it need not allege any new jurisdictional facts or urge additional grounds for dependency because the juvenile court already has jurisdiction over the child based on its findings on the original section 300 petition. ([*Ibid.*]; *In re A.O.* (2010) 185 Cal.App.4th 103, 110. . . .)" (*In re F.S.* (2016) 243 Cal.App.4th 799, 808 (*F.S.*).)

"At the conclusion of the hearing on a supplemental petition the court must make findings that: [¶] (A) The factual allegations are or are not true; and [¶] (B) The allegation that the previous disposition has not been effective is or is not true." (Cal. Rules of Court, rule 5.565(e)(1)(A), (B).)

"If the court finds the allegations are true, it conducts a dispositional hearing to determine whether removing custody is appropriate. [Citations.] ' "The ultimate 'jurisdictional fact' necessary to modify a previous placement with a parent or relative is that the previous disposition has not been effective in the protections of the minor." ' " (*F.S., supra*, 243 Cal.App.4th at p. 808.) "We review the court's jurisdictional and dispositional findings on a supplemental petition for substantial evidence." (*Id.* at pp. 811–812.)

[5] We review the interpretation and application of statutes de novo. (*In re M.F.* (2022) 74 Cal.App.5th 86, 100 (*M.F.*).)

21

reunification period, the court is prohibited from terminating services and must order that additional services be provided. [Citations.] The court may in its discretion extend reunification services beyond 18 months, and up to 24 months, but only if certain findings are made. ([]§ 361.5, subd. (a)(4)(A). . . .)" (*In re Christian K.* (2018) 21 Cal.App.5th 620, 627.)

"*After the selection of a permanent plan*, periodic review hearings must be conducted pursuant to section 366.3. [Citation.] If the permanent plan is either for adoption or guardianship, that statute calls for the juvenile court to retain jurisdiction until either step is accomplished, and to review the child's status every six months to ensure that the plan 'is completed as expeditiously as possible.' (§ 366.3, subd. (a).) For all other children (i.e., those who have neither been ordered placed for adoption nor with a legal guardian), section 366.3 specifies that 'the status of the child shall be reviewed at least every six months' (*id.*, subd. (d)) in order to inquire into 'the progress being made to provide a permanent home for the child,' which inquiry also 'shall consider the safety of the child' (*id.*, subd. (e))." (*In re C.W.* (2019) 33 Cal.App.5th 835, 840 (*C.W.*), italics added.)

Once the case reaches the post-permanent plan phase, "there is a statutory presumption in favor of continued out-of-home placement rather than efforts to return the child home. Subdivision (f) of section 366.3 states: 'It shall be presumed that continued care is in the best interests of the child, unless the parent or parents prove, by preponderance of the evidence, that further efforts at reunification are the best alternative for the child.' . . . In such cases, the statute permits the court to order 'further reunification services to return the child to a safe home environment' for up to six months, and family maintenance services 'as needed' for an additional six months. (*Ibid.* . . .) . . . 'By placing the burden of proof on the parent and focusing

exclusively on the child's best interests, section 366.3, subdivision (f) promotes the welfare of the child and avoids interference with permanency planning, while leaving open the possibility of reunification in those rare cases where it might remain the child's best option.' (*D.T. v. Superior Court* (2015) 241 Cal.App.4th 1017, 1041 [(*D.T.*)].)" (*C.W., supra*, 33 Cal.App.5th at pp. 840–841, italics omitted; *In re J.F.* (2011) 196 Cal.App.4th 321, 330.)

There is no dispute that, here, the juvenile court treated the case as still at the pre-permanency plan stage and acted under section 361.5. Mother contends the case was at the post-permanency stage and the court "should have ordered services" pursuant to section 366.3, subdivision (f).

To begin with, mother has forfeited this issue on appeal. All the parties operated under the assumption mother was not entitled to services under section 361.5, and at no point did any party object to the applicability of that statute. Accordingly, any objection to the juvenile court's reliance on that statute has been forfeited. (See *D.T., supra*, 241 Cal.App.4th at p. 1034; *In re Dakota S.* (2000) 85 Cal.App.4th 494, 501–502.)

Even assuming mother did not forfeit the issue, the cases on which she relies are distinguishable and do not establish that the court here erred by acting under section 361.5, rather then section 366.3.

She first cites to *D.T., supra*, 241 Cal.App.4th 1017. That case concerned a "protracted and complicated" dependency proceeding spanning 11 years and involving multiple petitions under sections 300, 387, and 388. (*D.T.,* at pp. 1021–1025, 1040.) As relevant, the juvenile court terminated mother's reunification services after 18 months and adopted a permanent plan of legal guardianship with the minors' aunt. After mother filed a subsequent section 388 petition and the Agency filed a section 387 petition, the court terminated the aunt's guardianship and returned the minors to

23

mother's care. After years of problems, the Agency filed another section 387 petition, this time to remove the minors from mother's custody. The juvenile court subsequently denied reunification services to mother under section 361.5, subdivision (b)(10) bypass provisions. (*D.T.*, at pp. 1021–1027.)

On appeal, the mother asserted the court had erred in denying services under section 361.5, subdivision (b)(1). (*D.T., supra*, 241 Cal.App.4th at p. 1021.) The Court of Appeal agreed that section was no longer applicable but concluded any error in the court's invocation of that statute was harmless because the standard applicable thereunder was "unduly favorable to Mother." (*Id.* at p. 1034.) With respect to whether section 361.5 was applicable, the appellate court explained that by the time of the post-petition 12-month review hearing, mother had received 18 months of services and had "already received all of the services available to her under section 361.5. . . ." (*D.T.,* at pp. 1023, 1034–1035.) Seven years of "intervening events did not revive her entitlement to services under that section." (*Id.* at p. 1035.)

Here, in contrast, minor was returned to mother's care after the 12-month review hearing but *before* the 18-month review hearing date, and he was removed again *before* the 18-month review hearing. Accordingly, mother here, unlike the mother in *D.T.*, had not already "received all of the services available to her."

*In re Malick T.* (2022) 73 Cal.App.5th 1109 (*Malick*), which mother also cites, is also distinguishable. In that case, the juvenile court terminated the mother's reunification services and set a section 366.26 hearing. (*Malick*, at pp. 1116–1117.) The hearing was later continued, and the court proceeded to a "permanency planning review hearing under section 366.3." (*Id.* at p. 1117.) It found continued jurisdiction was necessary and ordered adoption as the permanent plan. (*Ibid.*) At the first section 366.3 hearing six months

later, the court confirmed adoption as the permanent plan and once again continued the section 366.26 hearing. (*Malick,* at p. 1117.) Three months later, the Department filed a section 387 petition to remove the mother's oldest child from his father's home. (*Malick,* at pp. 1117–1118.) Six months after the disposition of the section 387 petition, mother filed section 388 petitions seeking additional reunification services. (*Malick,* at p. 1118.) The court denied the section 388 petitions because the time to reinstate reunification services for the majority of the mother's children " 'ha[d] expired' " and because immediate return of the children was not in their best interests. (*Malick,* at p. 1121.)

On appeal, the mother asserted the juvenile court had erred in denying services. The Court of Appeal agreed, pointing out that the fact the case had "proceeded to postpermanency plan review under section 366.3," did not mean the juvenile court lacked all authority to order additional reunification services. (*Malick, supra*, 73 Cal.App.5th at pp. 1124–1125.) Here, in contrast, the case had not yet proceeded to post-permanency review.

Mother asserts section 366.3 applies because in its order returning minor to mother, the juvenile court stated, "The appropriate permanent plan is reunification of the minor and placement in the home of the parent or legal guardian. The permanent plan is finalized today." Mother reads the "permanent plan" language as meaning the case, at that moment, moved to the post-permanency stage governed by section 366.3.

As the Agency observes, mother conflates return of a child to a parent, which was the outcome of the 12-month permanent planning hearing mother references, and the formal adoption of "reunification as the permanent plan" after services have been terminated or denied pursuant to section 361.5.

At the 12-month permanency planning hearing, the court "shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment." (§ 366.21, subd. (f)(1).) That the juvenile court here happened to use the phrase "permanent plan" at the permanency planning hearing, does not mean this triggered the post-permanency review process under section 366.3. (See *M.F., supra*, 74 Cal.App.5th at p. 101 & fn. 6 [the " '12-month review hearing' is described in the statute as the 'permanency hearing' . . . or '12-month permanency hearing' . . . and also may be called the '12-month permanency review hearing' "].)

Indeed, California Rules of Court, rule 5.565(f) anticipates the situation where the minor is returned a parent and a subsequent section 387 petition is filed, once again removing minor. California Rules of Court, rule 5.565(f) states, "If a dependent child was returned to the custody of a parent or guardian at the 12-month review or the 18-month review or at an interim review between 12 and 18 months and a section 387 petition is sustained and the child is removed once again, the court must set a hearing under section 366.26 unless the court finds there is substantial probability of return within the next 6 months or, if more than 12 months had expired at the time of the prior return, within whatever time remains before the expiration of the maximum 18-month period."

*Carolyn R. v. Superior Court* (1995) 41 Cal.App.4th 159 (*Carolyn R.*), is instructive. In that case, the juvenile court removed the mother's children, adjudged them dependents, and ordered reunification services. (*Id.* at p. 162.) Eight months later, the children were returned to mother's care with family maintenance services. They remained with the mother for eight

26

months, until the county filed a section 387 petition, which the court sustained. (*Carolyn R.,* at p. 162.) At the dispositional hearing, the mother claimed she was entitled to 12 months of reunification services. The court denied mother's request, finding she had exhausted the period for reunification and set the matter for a permanency planning hearing. (*Id.* at pp. 162–163.)

The mother appealed challenging the denial of further services. The Court of Appeal affirmed. "When a juvenile court sustains a supplemental petition pursuant to section 387, the case does not return to ' "square one" ' with regard to reunification efforts. [Citations.] Instead, the question becomes whether reunification efforts should resume. The answer is yes if: the parent has received less than 12 months of child welfare services (§[§] 361.5, subd. (a), 366.21, subd. (e)); the parent did not receive reasonable child welfare services (§[§] 366.21, subd. (g)(1), 366.22, subd. (a)); or the case has passed the 12-month mark but there is a substantial probability the child will be returned within 18 months of the date the child was originally removed from the parent's physical custody (§ 366.21, subd. (g)(1)). Simply put, the court determines at what chronological stage of the 12 to 18-month period the case is for reunification purposes and then proceeds pursuant to section 366.21 or section 366.22 as appropriate. Failure to order additional reunification services when a court removes a child from parental custody incident to a section 387 petition is reversible error only if under the particular facts of the case the juvenile court abuses its discretion in failing to order such services." (*Carolyn R., supra,* 41 Cal.App.4th at pp. 166–167, fn. omitted.) The appellate court went on to conclude the juvenile court did not err in denying reunification services to the mother because by the time the court sustained the section 387 petition, the case had reached the 18-month

review stage.  (*Carolyn R.,* at p. 167.)  At that point, none of the limited circumstances for extending reunification services beyond the 18-month period were applicable.  (*Ibid.*)

Here, too, by the time the juvenile court sustained the section 387 petition, mother had reached 18 months of services under section 361.5.  This meant the court could only have extended services under very limited circumstances, which we discuss in the next section.  (See *Carolyn R., supra,* 41 Cal.App.4th at p. 167.)

Mother, once again citing to *D.T.,* attempts to distinguish *Carolyn R.* and California Rules of Court, rule 5.565(f), asserting *Carolyn R.* "does not address section 366.3" and rule 5.565(f) " 'govern[s] situations in which the parent has exhausted reunification services available under section 361.5, but no permanent plan has been selected," but here, according to mother, a permanent plan was selected.  However, as we have explained, the "permanent plan" language at the *permanency planning* hearing did not move the case into the post-permanency phase.  *D.T.* does not hold to the contrary.  Nor does it hold that returning a minor to a parent within the statutory time limits of section 361.5 means that a "permanent plan" has been established and the parent qualifies for additional reunification services under section 366.3.  Indeed, the *D.T.* court went on to state that California Rules of Court, rule 5.565(f), "by its terms, applies only through the 18-month review and not in the post-permanency period" and in *D.T.,* "the children were not returned to mother until a much later stage of the proceedings." (*D.T., supra,* 241 Cal.App.4th at p. 1037.)

In sum, even if the issue was not forfeited, the juvenile court did not err in determining whether to extend reunification services under section 361.5.

***Reasonable Services Under Section 361.5[6]***

Mother alternatively contends that "[e]ven if section 361.5 . . . applied," under "case precedent, the court had discretion to continue services, even though 18 months had lapsed since initial entry into foster care, when services provided were not reasonable."

"[A] narrow exception allows the continuation of services under certain exceptional circumstances [beyond the 18-month statutory limit]: pursuant to subdivision (b) of section 366.22, if the juvenile court determines at the 18-month permanency review hearing that the best interests of the child would be met by the provision of additional reunification services, and if the court concludes that reasonable services were not provided to the parent or there is a substantial probability the child will be returned to the parent's physical custody and safely maintained in the home within the extended period of time, the court may continue the matter for up to six months so that additional reunification services may be provided. This exception applies only if the parent is (1) a parent making significant and consistent progress in a court-ordered residential substance abuse treatment program, (2) a minor or a dependent parent at the time of the initial hearing who is making significant and consistent progress in establishing a safe home for the child's return, or (3) a parent who was recently discharged from incarceration, institutionalization, or the custody of the Department of Homeland Security (DHS) and who is making significant and consistent progress in establishing

---

[6] " 'In reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the respondent. We must indulge in all legitimate and reasonable inferences to uphold the verdict. If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed.' " (*In re Precious J.* (1996) 42 Cal.App.4th 1463, 1472.)

a safe home for the child's return." (*Michael G. v. Superior Court* (2021) 69 Cal.App.5th 1133, 1141–1142 (*Michael G.*).)[7]

As the court in *Michael G.* recognized, " '[t]here is a split of authority in case law whether the juvenile court must observe the 18-month deadline for setting a section 366.26 placement hearing' " beyond the three categories of parents discussed in section 361.5 and " 'when reasonable services have not been provided.' ([*In re M.F.* (2019)] 32 Cal.App.5th [1,] 21 [collecting cases]; see *id.* at p. 23 [concluding dependency statutes allow court to 'extend services on a finding that reasonable services were not offered or provided to a parent, even if it means that services will be offered beyond the 18-month review date'].)" (*Michael G., supra*, 69 Cal.App.5th at p. 1143.)

Relying on *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229 (*T.J.*), mother asserts reversal and remand is necessary. *T.J.* was a "neglect case involving an intellectually disabled parent with some accompanying mental illness, struggling to raise her children in conditions of abject poverty." (*Id.* at p. 1250.) At the 12-month hearing, which was actually completed at the 15-month mark, the court found reasonable services had been provided and mother's progress had been adequate, but she was unlikely to reunify with her children within the next three months. The court therefore terminated services and set the matter for a section 366.26 hearing. (*T.J.*, at p. 1237.) Mother sought writ relief asserting she was denied adequate services. (*Id.* at p. 1238.)

---

[7] Review was granted in *Michael G., supra*, 69 Cal.App.5th 1133, on January 19, 2022, S271809, on the issue of whether juvenile courts are required to extend reunification services beyond the 18-month review period when families have been denied adequate reunification services in the preceding review period.

The Court of Appeal (Division Four of this court) granted relief, concluding the Agency had "put mother in a holding pattern" that had resulted in months of delay for some services and complete failure to provide others. (*T.J., supra*, 21 Cal.App.5th at p. 1248.) Thus, notwithstanding the 18-month statutory limitation, the court held "where . . . a timely challenge to the adequacy of services for the statutorily required minimum period—here, 12 months—is sustained, that failure to provide services will justify the extension of services beyond 18 months, even without a showing of best interests of the child or substantial probability of return, and even if the permanent plan is not to return the child to the parent." (*Id.* at p. 1256.)

Even assuming a juvenile court has discretion to extend reunification services beyond the 18-month mark outside of the three statutorily specified categories—an issue we do not decide—*T.J.* is distinguishable.

To begin with, in the instant case, there "were three reasonable services findings leading up to the [section] 387" hearing that mother "did not contest." If mother felt during her reunification period that the Agency was not providing adequate services, she "had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan[.]" (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.) She could not sit idly by and wait until the close of the reunification period to challenge the adequacy of services provided. Otherwise, a parent could " ' "be silent as to [her] objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal." ' " (*Ibid.*; see *Los Angeles County Dept. of Children etc. Services v. Superior Court* (1997) 60 Cal.App.4th 1088, 1093 [parent may not "wait silently by until the final reunification review hearing to seek an extended reunification period based

31

on a perceived inadequacy in the reunification services occurring long before that hearing"].)[8]

Even had mother objected and preserved the issue, she was provided with case plans and referrals throughout the proceedings leading up to minor's return to her care. During the time he was first removed, minor engaged in individual therapy, was in compliance with his medication, and had the support of an intensive services foster care support worker. Additionally, minor and mother received four, in-person family therapy sessions. All of these services ultimately led to minor's return.

Although mother asserts the Agency did not provide family therapy, that is not a fair characterization of the record. As we have recited, the Agency made repeated efforts to facilitate family therapy. It provided referrals for therapy for both mother and the minor, with the aim of moving to family therapy. When the minor refused to participate in visitation and family therapy, the Agency informed mother the goal was for him to keep going to individual therapy "and then progress" to family therapy. Minor's most recent therapist opined minor was "doing well in therapy and is coming to realize he has things he needs to work on for himself." However, he was "not close to talking about his mother and the relationship between them" and would " 'blow a gasket' " if mother showed up at an assessment before the minor was mentally ready for such an encounter. Indeed, the Agency maintained that forcing such therapy before minor, himself, is ready for it, will be detrimental to their efforts to assist him. Further, minor threatened

---

[8] To "the extent there would have been any waiver or forfeiture of the arguments raised herein," mother claims she "was provided ineffective assistance of counsel." However, as we shall discuss, we reject mother's contention she was not provided with reasonable services, and therefore we need not, and do not, address her claim of ineffective assistance of counsel.

harm to mother, stating he had kicked her in the past and still wanted to kick her. Mother also reported she "did not feel safe" after minor had "told his psychiatrist of physical threats against the parents."

There is no question that mother has consistently expressed her desire that minor's behavioral problems be treated and he be returned to the family home. But it is not for want of efforts by the Agency that mother has not received the family counseling she believes can accomplish these goals. Neither the Agency, nor mother, nor minor's own therapists, can force minor to engage in therapy for which the minor is not prepared. (See *In re F.P.* (2021) 61 Cal.App.5th 966, 975 ["[T]here is no statutory right to counseling. . . . A court may properly decline to order conjoint counseling if the child's therapist believes the child is not ready for it."]; see also § 362.1, subd. (a)(1)(B) ["No visitation order shall jeopardize the safety of the child."]; *Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 673 [determining " '[w]hile visitation is a key element of reunification, the [juvenile] court must focus on the best interests of the children "and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm" ' "].)

" 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, 1159.) The Agency's efforts meet that standard. Thus, even assuming mother can, at this belated stage, challenge the reasonableness of the services, the record supports the juvenile court's September 2021 ruling that reasonable services were provided.

## DISPOSITION

The order is AFFIRMED.

_____
Banke, J.

We concur:

_____
Humes, P.J.

_____
Devine, J.*

*Judge of the Contra Costa Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A163836, In re XF